UNITED STATES v. ABRAMS et al.

(Circuit Court, E. D. Oklahoma. September 19, 1910.)

No. 1,113.

1. INDIANS (§ 27*)—INDIAN LAND—LEASE.

Under Act Cong. June 7, 1897, c. 3, § 1, 30 Stat. 72, authorizing Indian allottees within the limits of the Quapaw agency to lease their allotments for a term not exceeding 10 years, where a lease of such land is made for a period exceeding 10 years, the United States may sue in its own name to cancel the instruments as a violation of congressional conditions placed on the alienability of the land, but with reference to leases for purposes named in the act, and which do not exceed the term allowed, the government has no capacity to sue to cancel the same, though made by the allottee for an improvident consideration.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 45; Dec. Dig. § 27.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. INDIANS (§ 16*)—INDIAN LANDS—ALLOTMENT—LEASING.

Under Act Cong. June 7, 1897, c. 3, § 1, 30 Stat. 72, authorizing the leasing of Indian allotments within the limits of the Quapaw agency subject to the condition that such leases should not extend for more than 10 years for mining or business purposes, an Indian allottee had complete power to lease his land in any manner and for any consideration he might desire, except that the term should not extend beyond that prescribed.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 45; Dec. Dig. § 16.*]

3. INDIANS (§ 16*)—LEASES—EFFECT.

Where an Indian allottee in the Quapaw agency leased his allotment for mining purposes for 10 years, and before the expiration of such lease granted another lease for a similar term to run concurrently without cumulation of periods, the second lease to the holder of the first operated as a surrender of the first, and was therefore not a violation of Act Cong. June 7, 1897, c. 3, § 1, 30 Stat. 72, limiting the period of such leases to 10 years.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 45; Dec. Dig. § 16.*]

4. INDIANS (§ 16*)—INDIAN LANDS—ALLOTMENT—LEASES.

An Indian allottee in the Quapaw agency, being authorized to lease his allotment for mining purposes for 10 years by Act Cong. June 7, 1897, c. 3, § 1, 30 Stat. 72, having done so, had authority during the term to agree with the tenant to annul the lease, and execute a new one for the maximum period.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 45; Dec. Dig. § 16.*]

5. INDIANS (§ 16*)—INDIAN LANDS — ALLOTMENT — LEASES —ASSIGNMENT OF ROYALTIES.

Where an Indian allottee in the Quapaw agency leased his allotment for mining purposes, reserving a royalty for the maximum period authorized by Act Cong. June 7, 1897, c. 3, § 1, 30 Stat. 72, an assignment of the royalties payable under the lease was valid.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 45; Dec. Dig. § 16.*]

In Equity. Bill by the United States against A. W. Abrams and others. On demurrer to bill. Sustained in part.

Paul A. Ewert, for the United States.

J. J. Bulger, V. E. Thompson, and S. C. Fullerton, for defendants.

CAMPBELL, District Judge. In March, 1893, the National Council of the Quapaw Tribe of Indians, owning lands in what is now northeastern Oklahoma, passed an act providing for the allotment of said lands in severalty to the individual members of the tribe, subject to congressional approval, and rules and regulations to be prescribed by the Secretary of the Interior. By Act March 2, 1895, c. 188, 28 Stat. 907, it was provided:

"That the allotments of land made to the Quapaw Indians, in the Indian Territory, in pursuance of an act of the Quapaw National Council, approved March 23rd, 1893, be and the same are hereby ratified and confirmed, subject to revision, correction and approval by the Secretary of the Interior: Provided, however, that any allottee who may be dissatisfied with his allotment shall have all the rights to contest the same provided for in said act of the Quapaw National Council subject to revision, correction, and approval by the Secretary of the Interior. And the Secretary of the Interior is hereby au-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes

thorized to issue patents to said allottees in accordance therewith: Provided, that said allotments shall be inalienable for a period of twenty-five years from and after the date of said patents: And provided further, that the surplus lands on said reservation, if any, may be allotted from time to time, by said tribe to its members, under the above entitled act."

On September 26, 1896, pursuant to said act of Congress, a patent for the land involved in this case was issued to Charley Quapaw Blackhawk, a member of said tribe, with habendum clause as follows:

"Now, know ye, that the United States of America, in consideration of the premises, and in conformity with the provisions in said act of Congress approved March 2, 1895, the order and schedule of allotment aforesaid, has given and granted, and by these presents does give and grant unto the said Charley Quapaw Blackhawk, and to his heirs, the said tract above described; but with the stipulation and limitation contained in the aforesaid act, that the land embraced in this patent shall be inalienable for the period of twenty-five years from and after the date hereof; to have and to hold the same, together with all the rights, privileges, immunities and appurtenances of whatsoever nature thereunto belonging, unto the said Charley Quapaw Blackhawk, and to his heirs forever: Provided, as aforesaid, that said tract shall be inalienable for the period of twenty-five years."

On June 7, 1897 (Act June 7, 1897, c. 3, § 1, 30 Stat. 72), Congress further provided:

"That the allottees of land within the limits of the Quapaw agency, Indian Territory, are hereby authorized to lease their lands, or any part thereof, for a term not exceeding three years, for farming or grazing purposes, or ten years for mining or business purposes. And said allottees and their lessees and tenants shall have the right to employ such assistants, laborers and help from time to time as they may deem necessary: Provided, that whenever it shall be made to appear to the Secretary of the Interior that, by reason of age or disability, any such allottee cannot improve or manage his allotment properly and with benefit to himself, the same may be leased, in the discretion of the Secretary, upon such terms and conditions as shall be prescribed by him. All acts and parts of acts inconsistent with this are hereby repealed."

This is a suit by the United States to cancel certain lease contracts and contracts assigning royalties thereunder entered into by the allottee with the various defendants. Demurrers are interposed by the defendants on the ground that the government has no such interest in the action as will entitle it to maintain the bill, and that there is no equity in the bill. If from the bill it appears that any of the alleged contracts or leases are in violation of the conditions or limitations imposed by acts of Congress, under which the allottee has taken his allotment, then the complainant has such interest as entitles it to maintain this action. United States v. Allen (C. C. A.) 179 Fed. 13. Do the leases or contracts sought to be canceled violate the provisions of such acts of Congress? On June 11, 1902, the allottee leased his allotment to the defendant Abrams for mining purposes for the term of 10 years for a cash payment of $10, and a royalty of 5 per cent. of the market value, at the place mined or produced, of all mineral produced, except gas, for which a royalty of $40 per annum for each paying well was to be paid. The 5 per cent. royalty provided for was to be paid monthly, and, pending such operation as would result in a royalty exceeding $20 per annum, the lessee agreed to pay a minimum annual royalty of $20. The complainant concedes the foregoing lease to be a valid lease, and contends that it is still in force, and that all

181 F.—54

subsequent leases and contracts are invalid. On August 13, 1903, the foregoing lease was assigned by Abrams to the defendant, the Iowa & Oklahoma Mining Company. The bill further alleges that on August 24, 1903, the allottee and said Abrams entered into another mining lease contract for the term of 10 years from date thereof, covering the same land, in consideration of a cash payment of $18, and royalty of 5 per cent. on the output, and a minimum annual royalty of $21. This contract contains this clause:

"All leases or parts of leases heretofore made are by mutual consent canceled, annulled, and abrogated."

It appears that on November 2, 1904, Abrams assigned the last-mentioned lease to the Iowa & Oklahoma Mining Company. It is further alleged that on March 25, 1905, the allottee executed a mining lease on the same property to L. C. Jones and A. J. Thompson, for the term of 10 years, for a cash bonus of $10 and a 5 per cent. output royalty. This lease has this clause:

"Subject to prior mining lease executed by said first party January 1st, 1902, unto A. W. Abrams."

On July 31, 1905, the lessee, Jones, assigned his interest in said lease to Thompson:

The bill further alleges that on April 4, 1905, the allottee leased his said allotment to the said Iowa & Oklahoma Mining Company for mining purposes for a term of 10 years from date, for a cash bonus of $25 and 5 per cent. output royalty, $40 per annum for each gas well, and a minimum annual royalty of $21. No reference is made in this lease to any former leases. It is further alleged that on the 22d day of May, 1906, the allottee leased his said allotment to the said Iowa & Oklahoma Mining Company, for mining purposes, for the term of 10 years from date, for a cash bonus of $25 and 5 per cent. output royalty, $40 per annum for each paying gas well, and a minimum annual royalty of $21. The last-mentioned lease also contains this provision:

"Provided, that it is expressly understood and agreed by and between the parties hereto that the execution and delivery and acceptance of this lease shall not in any manner be construed as a waiver or relinquishment by the lessee of any rights, title, interest, or claim which it now holds, owns, or enjoys under and by virtue of prior leases held by it upon the lands above described, which leases are recorded within the office of the deputy clerk and ex-officio recorder in and for the First recording district of Indian Territory, at Miami, in Book 'Q,' at page 558, in Book 'S,' at pages 55 and 177, and this lease and all former leases above referred to shall run concurrently; that it is expressly declared that no merger of the leases above referred to into each other or into this lease is contemplated by the execution of this lease; and that the said party of the second part may elect under which of the leases it holds upon the lands above described that it will operate and make payments to said first party, and that the payments and performances by said second party under either of the leases it holds upon said lands shall be in full payment and satisfaction of all requirements and conditions set forth in said several leases held by it upon said land for the term of said respective leases above referred to."

"(The foregoing clause constitutes a part of the written terms and conditions of a certain mining or business lease executed by Charley Quapaw Blackhawk to the Iowa & Oklahoma Mining Company of Baxter Springs, Kansas, dated May 12th, 1906, upon the N. W. ¼ and the N. W. ¼ of the S. W. ¼

of Sec. 32, Twp. 29, R. 24, Quapaw Reservation, Ind. Ter., and is attached to and made a part thereof.)"

It is further alleged that on July 28, 1906, the allottee made a mining lease to the said Iowa & Oklahoma Mining Company, covering his said allotment, for the term of 20 years from date, for a cash bonus of $21, 5 per cent. output royalty, $40 per annum for each paying gas well, and a minimum annual royalty of $21. The last-mentioned lease has this provision:

"Provided, that it is expressly understood and agreed by and between the parties to this lease that this lease and those certain mining leases held by said second party and recorded in the office of the deputy clerk and ex-officio recorder in and for the First recording district, Indian Territory, in Book 'Q,' p. 558, Book 'S,' p. 55, and Book 'S,' page 177, & Book 'G,' pages 296–297, shall run concurrently until the expiration of the said leases respectively; and that no waiver, relinquishment, or forfeiture of any of the rights or interests now held by said second party under the prior leases is intended by the execution, delivery, and acceptance of this lease, and that no merger shall be effected of said prior leases, or any of them, because of the execution, delivery, and acceptance of this lease; also that second party shall have the right to elect under which of said leases it will operate or hold said lands, and that payments or performances of the terms and conditions of any of the said leases shall be in full payment and satisfaction of all terms and conditions of like in all leases held by it upon said lands."

It is alleged in the bill that the allottee was born in 1835. If so, he was between 60 and 70 years of age when most of the leases were made, and 71 when the last one was made. It is alleged that he is unable to read or write or understand intelligently the English language; that he was old and infirm, and wholly incompetent of transacting business; and that defendants in the procurement of the leases sought to be canceled fraudulently took advantage of said allottee's age and incapacity. It does not appear, however, that his condition has been brought to the attention of the Secretary of the Interior pursuant to that proviso in the leasing act of 1897, authorizing the Secretary to lease lands of incompetent Indians upon such terms and conditions as he might prescribe, and, in view of the admission in the bill that the first lease was a valid lease, it appears that complainant does not contend that the allottee could not or should not have availed himself of the leasing provisions of the act preceding the proviso, but does contend that either because of the said fraud practiced upon him or the illegality of subsequent lease, because violating the provisions of the act, the government may maintain this suit.

The act of Congress granting authority to lease for mineral purposes contained one limitation, to wit, that the term should not exceed 10 years. A lease for a longer term would be invalid, and hence the lease of July 28, 1906, to the Iowa & Oklahoma Mining Company, for 20 years, is invalid, and should be canceled. The law makes no provision as to the amount of consideration that shall be paid, or any other terms, except as to duration. No supervision of the contract is provided for by the Secretary of the Interior, or any agent of the government. It appears that Congress, while still imposing the general condition against alienation for 25 years, has seen fit to modify that to the extent of vesting in the allottee the right, on his own responsibility, to enter into lease contracts for a limited term. No doubt

Congress conceived that it would be for the welfare of the Indian to take upon himself this limited responsibility regarding his land. At the expiration of the 25-year term, unless further extended, he would have absolute control. The right in the meantime to make the limited lease contracts provided for, bringing him into contact with others in a business way, it was no doubt conceived would enable him to reap some benefit from his allotment in the meantime, other than he might gain by his own labor thereon, and accustom him to business dealings, preparatory for the ultimate absolute control of his property. The allottee in this case is a citizen of the United States and of the state of Oklahoma. General Allotment Act (Act Feb. 8, 1887, c. 119, § 6, 24 Stat. 390), as amended by Act March 3, 1901, c. 868, 31 Stat. 1447; Oklahoma Enabling Act (Act June 16, 1906, c. 3335, 34 Stat. 267). If in the making of any mineral lease contract, running for a lawful term, he is overreached in some fraudulent manner relating to the consideration or other feature of the lease, such as would entitle any citizen to maintain an action in court for legal redress, he has such right of action, which he may prosecute in the proper court in his own name. It is held in United States v. Allen, supra, that a deed or lease procured in violation of the acts of Congress imposing restrictions upon alienation, as, for instance, an attempted sale of inalienable land or an attempted lease for a longer period than the law provides, is such violation of the governmental policy involved in the making of such allotments as entitles the government, in its own name, to sue for the cancellation of such instruments. In such case there is a clear violation of conditions imposed by Congress as to alienability. Where, however, as in this case, Congress has extended the right to lease with no condition except that for a particular purpose the term shall not exceed a certain number of years, if the lease is expressly for the purpose contemplated in the act, and does not exceed the term allowed, I can conceive in the act permitting leasing no governmental policy, either express or implied, which would enable the government to maintain an action in its own name to cancel such lease. In making the allottee a citizen and in vesting him with power to lease for a particular purpose and term for such consideration as might be agreed upon between him and his lessee, I think it was the intention of Congress that in all respects, save as to the purposes, which must be either grazing, farming, or mineral, and the term, which must not exceed a prescribed period, the allottee is clothed with just as full and complete power to lease his land as his white brother, and if, though the lease be for a lawful term and purpose, he is imposed upon by the lessee in regard to some other feature in such way as would give a white citizen a right of action for legal redress, then he, and not the government, must bring the suit. The mere fact, therefore, that by fraud the lessee may have secured a lease for a manifestly inadequate consideration would not entitle the government to sue if it appears to be made for a lawful purpose and term.

In my opinion Congress intended that within the limitations as to purposes and term the allottee should exercise the same independent right to lease his property and enjoy the proceeds thereof that the law gives to other citizens, and, in lieu of the governmental supervision

thus partially withdrawn, gave him the status of a citizen and access to a forum where, like any other citizen, he could redress his wrongs. I believe that it was the intention of Congress that within the limitations mentioned this right of disposal of his property by leasing was granted as a means of affording him that experience in business affairs necessary to enable him to eventually handle his property without any restrictions whatever. This is consistent with the purpose manifested by Indian legislation of recent years to hasten, as much as may be, consistent with his welfare, the time when the Indian in this state shall have the same rights of disposition of his property as his white neighbor exercises over his. Hence the absolute supervision so long exercised by Congress over the Indians, keeping them a people apart from other races, dependent and incapable, is gradually being withdrawn, and, while it is the duty of the courts to recognize the existence of such supervision wherever it does not appear to have been withdrawn, it is equally their duty to recognize in the Indian that measure of independence and equality under the law with his white brother which the acts of Congress, from time to time, indicate that body intended the Indian should have, bearing in mind, of course, that wherever an act under consideration is fairly capable of more than one construction that construction should be given most favorable to the Indian.

Now, turning to the leases in question. The first one, that of January 11, 1902, is conceded to be a valid lease, being for a lawful purpose and term, and its cancellation is not sought. The second one, of August 24, 1903, to the same lessee, expressly provides that all leases theretofore made are by mutual consent canceled, annulled, and abrogated. It is for a lawful purpose and term. Does the fact of a former lease or assignment thereof disqualify the parties from making this lease? Certainly, if the allottee could make the former lease, he could agree with the lessee that it might be canceled and annulled. I cannot agree with the contention that, having made the lease for the term of 10 years, the allottee's hands are tied, and he cannot enter into an agreement modifying or canceling the first lease during its term. But for the assignment to the Iowa & Oklahoma Mining Company, whereby that company had acquired rights under the first lease, I am of the opinion that this second lease would have annulled the first lease, and would have given the lessee the same rights thereunder as if no former lease had been made.

Passing to the lease of March 25, 1905, to Jones and Thompson, this lease was for a lawful purpose and period. It was made subject to the first Abrams lease. It does not appear that the lessees, Jones and Thompson, are in any way connected with Abrams or the mining company. The question is presented whether the allottee may, while he has one outstanding lease, make another lease to another lessee, which does not exceed the lawful term, so that the second lessee may enjoy that portion of his term beyond the termination of the first lease. Such an agreement might be made between white persons, and, so long as such lease is for one of the purposes provided in the act and not for a longer term than that prescribed, the term beginning with or near the date of the lease, I see no reason why it may not be validly

made by the allottee. It will be noted that the lease to Jones and Thompson is to run from "date hereof until March 25th, 1915"—10 years—so that there is not presented the case of an overlapping lease which is to begin to run in the future and the term of which, considered with the term of a prior existing lease, amount together to a longer time than the allottee is permitted to tie up his land by lease. Whitham v. Lehmer, 22 Okl. 627, 98 Pac. 351. I think the Jones and Thompson lease was at the time of its execution, so far as is shown by the bill, a valid lease, subject to the unexpired term of any valid existing lease previously made by the allottee. If during the existence of a 10-year lease the allottee should make a second lease to the first lessee or to another for a term of 10 years, to begin at the expiration of the first term, that, I think, would be a violation of the law, for the unexpired term and the term of the second lease would, together, amount to more than 10 years. But where, as in this case, the 10-year term of the second lease runs from the date of its execution, so that the land is not tied up by either or both leases for a longer term in the future than the law prescribes, there is no violation of the leasing act.

Now, taking up the lease of April 4, 1905, to the Iowa & Oklahoma Mining Company. This lease is for mining purposes and is limited to 10 years. There is, therefore, nothing on its face to suggest invalidity, and, were this the first appearance of this lessee, it would be in the attitude of the lessees Jones and Thompson, just considered. But it appears that at the time this lease was made this lessee had taken from the lessee Abrams an assignment of each of the leases he had taken from the allottee. Assuming that one or the other of the Abrams leases was valid and in force and assignable, then the mining company owned and was entitled to enjoy the unexpired term of such lease. In either event, such unexpired term was still running when this lease was made. If by the terms of this lease the former leases under which the mining company claimed had been expressly annulled, then there would be presented the question considered in relation to the second Abrams lease: Does the execution and acceptance of this lease, without any mention of former leases, operate to cancel and annul such former leases? "The acceptance by the tenant of a new lease during the term of the first lease constitutes a surrender by operation of law, unless the surrender would be contrary to the intention of the parties, and it is immaterial whether there was any actual surrender of the old lease." 24 Cyc. 1369. In Edwards v. Hale, 37 W. Va. 193, 16 S. E. 487, it is said:

"Taken alone, discarding the fact that a tenancy from year to year existed between these parties when it was made, it does show a lease for a specific term by Edwards to Hale. Hale could not in its face deny that he became Edwards' tenant in that property for a certain term, yielding certain rent. But, as a tenancy from year to year existed at the time, the question is, Did it supplant that tenancy? Roberts, Frauds, p. 254, states the law thus: 'A surrender in law of a lease in possession is implied in the acceptance of a new lease from the reversioner; for, if the lessee accept a new lease from his lessor, he admits and affirms his lessor's ability to make such new lease, which could not be done by him if the old lease stood in his way.' Same doctrine in Wood, Landl. & Ten. p. 492; 2 Tayl. Landl. & Ten. p. 512; 2 Lomax, Dig. 105. 'Where, pending a lease, a second lease is made, containing stipu-

lations inconsistent with the former lease, the latter shall prevail; the presumption being that a surrender of the old one was intended.' Wood, Landl. & Ten. p. 492."

See, also, Donkersley v. Levy, 38 Mich. 54; Enyeart v. Davis, 17 Neb. 228, 22 N. W. 449; Leyman v. Abeel, 16 Johns. (N. Y.) 30.

It is my opinion that the lease of April 4, 1905, to the mining company operated to cancel and annul the former lease originally given to Abrams, and assigned to the mining company. As to the respective rights of Thompson, holding under the Thompson and Jones lease, on the one hand, and the mining company, under the lease of April 4, 1905, on the other, that is a question not involved here. Each provides for a royalty of 5 per cent. of the ore produced, and I find nothing in either lease which is violative of the act permitting such leases. Taking up the lease to the Iowa & Oklahoma Mining Company, dated May 12, 1906, it will be noted that in this lease it is attempted to continue in force all former leases to this company, either as lessee or assignee, as well as create a new lease, and so that all may be considered as running concurrently, the mining company reserving the right to elect at any time under which lease it will operate and make payment, and that payment under one shall amount to payment under all. That is palpably an effort to combine the terms and conditions of the several leases into one lease, to cover the combined term of all, amounting to more than ten years, and is invalid. The lease of date July 28, 1906, to the Iowa & Oklahoma Mining Company is, as we have seen, for the term of 20 years, and therefore invalid.

If the conclusion that the lease to the mining company of April 4, 1905, operated to cancel and annul the former leases which it held as assignee, being the leases originally made to defendant Abrams, is correct, then by the contract of the parties the Abrams leases are of no effect, and a decree canceling them would serve to clear the record. The leases of May 12 and July 28, 1906, to the Iowa & Oklahoma Mining Company, are invalid, and should be canceled. The demurrers of the defendant Abrams and the Iowa & Oklahoma Mining Company will therefore be overruled. The demurrer of defendant A. J. Thompson will be sustained.

On August 16, 1902, the allottee entered into a contract with Charles F. Noble, purporting to "grant, bargain, sell, assign, transfer and set over" to said Noble all his right, title, and interest in and to the royalty, rental, and proceeds of the mining lease executed by the allottee to defendant Abrams under date of January 11, 1902. We have seen that this lease provided for a cash payment of $10 at date of execution, and "a sum of money equal to five per centum of the market value at the place mined or produced" of all substances to be mined, except gas, for which lessee was to pay $40 per annum for each paying well; and further provided for a minimum annual royalty of $20. The royalty was to be paid in money, based upon a per centum of the market value of the ore produced. A one-half interest in this contract was later assigned by defendant Noble to defendant Cooper. It is further alleged that on February 21, 1906, the allottee entered into a contract with defendants A. S. and V. E. Thompson, whereby he assigned to them as a fee for their services in litigation arising out of

the assignment to Noble one-half of the royalties recovered by the allottee in such litigation. The government seeks to cancel both the foregoing contracts assigning royalty, on the ground that the allottee cannot assign such royalties. The defendants have demurred to the bill, challenging the capacity of the government to sue, and asserting want of equity in the bill. The bill concedes that the lease upon which the royalties attempted to be assigned accrue is a valid lease. The law contemplates that the moneys representing the royalties arising therefrom shall become the absolute property of the allottee, to be disposed of as he may see fit. No provision is here made, as is done in many cases, by which payment shall be made to the Indian agent, and by him disbursed. Such a provision would have manifested an intention to extend the supervision of the government over the proceeds of these leases. The absence of such provision, on the other hand, manifests a congressional intent that the proceeds of such leases shall be at the disposal of the Indian. It is his to handle as he may see fit. If it is fraudulently taken from him, he has his remedy like any other citizen to recover it. It appears from the recitations in the assignments to the defendants Thompson that he invoked that remedy through them as counsel, and assigned to them as their fee a portion of the royalties recovered. I can conceive no reason why such assignments of royalties cannot be legally made. It is true the Indian may make most improvident contracts relating to such assignments, but Congress has seen fit to entrust him with the disposal of the moneys accruing from these royalties; and if, for a consideration satisfactory to himself, he sees fit to realize upon this fund in advance by assigning it, I can conceive nothing in the transaction violating any governmental policy expressed by any legislation relating to these Indians, which has been brought to my attention. In the matter of receiving and disposing of these royalties, as he may see fit, as in the matter of agreeing upon the consideration which shall be paid to him for a lease, for a lawful purpose and term, Congress has seen fit to place the Indian upon his own responsibility, and I cannot escape the conviction that Congress in so doing intended that, to that extent, he should take his place as a citizen of the United States and of the state, together with all other citizens of whatever race or color.

The demurrers of the defendants Noble, Cooper, and A. S. and V. E. Thompson are therefore sustained.