HALLAM v. COMMERCE MINING & ROY-
ALTY CO. et al.*
No. 288.

Circuit Court of Appeals, Tenth Circuit.
March 27, 1931.

Joseph W. Howell, of Tulsa, Okl., for appellant.

A. Scott Thompson, of Miami, Okl., and Geo. S. Ramsey, of Tulsa, Okl. (Ray Mc-Naughton and F. D. Adams, both of Miami,

*Rehearing denied June 1, 1931.

Okl., on the brief), for appellees Commerce Mining & Royalty Co., Jas. F. Robinson, Geo. L. and Alfred E. Coleman and Chas. M. Harvey.

Before PHILLIPS and McDERMOTT, Circuit Judges, and KENNEDY, District Judge.

PHILLIPS, Circuit Judge.

Anna Beaver Hallam, hereinafter called Anna Beaver, is a full blood Quapaw Indian. She was allotted a tract of two hundred acres of land in Ottawa county, Oklahoma, under the Act of March 2, 1895 (28 Stat. 876, 907), and on September 26, 1896, received a patent therefor. Under the act just mentioned, such land was inalienable for a period of twenty-five years from the date of patent.

Under the Act of June 7, 1897 (30 Stat. 62, 72), Quapaw Indians were empowered to lease their lands for mining purposes for a term of ten years. Under the Act of March 3, 1909 (35 Stat. 781, 783 [25 USCA § 396]), such Indians were empowered to lease their lands for mining purposes for "any term of years," with the consent of the Secretary of Interior. The pertinent portions of the two last mentioned Acts are set out in marginal note 1.

■ On September 30, 1907, Anna Beaver executed to Don P. Wills a mining lease on her allotment for a term of ten years. Such lease contained the following provision:

"If oil, or any minerals or other substance of value are found in paying quantities in any well drilled or shaft sunk, the privilege of operating shall continue as long as oil, minerals or other substances of value can be produced in paying quantities, on such terms and conditions as parties hereto have herein

agreed upon after the expiration of this lease."

This provision violated the restrictions imposed by Congress, and rendered the lease void. Smith v. McCullough, 270 U. S. 456, 46 S. Ct. 338, 70 L. Ed. 682.

On August 22, 1911, Anna Beaver executed to Wills a mining lease on her allotment for a term of ten years from its date. This lease did not violate any of the restrictions imposed by Congress. United States v. Abrams (C. C.) 181 F. 847; Id. (C. C. A. 8) 194 F. 82. On September 28, 1912, Anna Beaver executed to Wills a mining lease on her allotment for a term of ten years from its date. The Commerce Mining & Royalty Company is a common law trust created by a declaration of trust executed September 22, 1913. Its predecessor was a copartnership called the Miami Royalty Company. In 1913, Wills assigned the 1911 and 1912 leases to the Miami Company, which in turn assigned them to the Commerce Company.

On September 19, 1913, and January 21, 1915, Anna Beaver executed to Wills mining leases on her allotment each for a term of ten years from its respective date. In taking these two leases, Wills was acting as the agent of the Commerce Company and he assigned such leases to the Commerce Company.

On June 11, 1915, a contract was entered into between Anna Beaver and Wills, acting for the Commerce Company, by which it was agreed that all of such leases were surrendered and canceled, and that the possession of the leased premises was surrendered to Anna Beaver. Thereafter, and on the same date, Anna Beaver executed to Wills, as the agent of the Commerce Company, a new mining lease on her allotment for a term of ten years from its date at a royalty of 5%. Neither Wills nor those claiming under him went into possession of the leased premises under the leases of August 22, 1911, September 28, 1912, September 19, 1913, or January 21, 1915. The lease of June 11, 1915, among other things, provided:

"Second. · The party of the second part agrees to go upon said described land and mine and carry on mining operations thereon from the date hereof. * * *

"This lease shall be in full force and effect from the date hereof for a period of ten years, and the parties of the first part (Anna Beaver Bear and Thos. M. Bear, husband) agree to and do hereby deliver possession of said premises to said party of the second part

---

[1] "That the allottees of land within the limits of the Quapaw Agency, Indian Territory, are hereby authorized to lease their lands, or any part thereof, for a term not exceeding three years, for farming or grazing purposes, or ten years for mining or business purposes. * * * Provided, That whenever it shall be made to appear to the Secretary of the Interior that, by reason of age or disability, any such allottee can not improve or manage his allotment properly and with benefit to himself, the same may be leased, in the discretion of the Secretary, upon such terms and conditions as shall be prescribed by him." 30 Stat. 72.

"That all lands allotted to Indians in severalty, except allotments made to members of the Five Civilized Tribes and Osage Indians in Oklahoma, may by said allottee be leased for mining purposes for any term of years as may be deemed advisable by the Secretary of the Interior; and the Secretary of the Interior is hereby authorized to perform any and all acts and make such rules and regulations as may be necessary for the purpose of carrying the provisions of this paragraph into full force and effect." 35 Stat. 783 (25 USCA § 396).

for mining purposes concurrent with the delivery of this lease, and the party of the second part agrees to and does take possession and control of said described land for mining purposes concurrent with the execution of this lease."

Prior to the lease of June 11, 1915, the lands included in the above mentioned leases were undeveloped. Six prospect holes had been drilled along the north line of the allotment but no commercial ores had been discovered. Immediately following the execution of the lease of June 11, 1915, the Commerce Company commenced exploration and development on the allotment, and discovered and developed lead and zinc ores in commercial quantities. On February 26, 1917, the Commerce Company entered into a mining sub-lease with Bulkeley Wells, agent, on 180 acres of such allotment. Such sub-lease was later assigned to R. H. Channings, Jr., agent. On February 2, 1918, the Commerce Company entered into a mining sub-lease on the additional twenty acres with the Standard Zinc Lead Mining Company. Between June 11, 1915, and October 18, 1922, the Commerce Company and its sub-lessees expended approximately $900,000 in the exploration and development of the property, and the erection of mining plants thereon.

On April 30, 1919, the Secretary declared Anna Beaver incompetent to manage her mining business. In 1907, the Commissioner of Indian Affairs caused an investigation to be made as to the competency of the Quapaws to manage their business and to lease their lands without departmental supervision. On July 30, 1907, he reported to the Secretary the results of such investigation and recommended that supervision be retained over nine Quapaws. Anna Beaver was not one of such nine. On November 15, 1907, the Secretary adopted the recommendation of the Commissioner and struck the names of all other Quapaws from the incompetent class. From the foregoing it will be seen that from August 22, 1911, to April 30, 1919, Anna Beaver was both legally and actually competent to lease her land for mining purposes for a term of ten years.

By the Act of March 3, 1921 (41 Stat. 1225, 1248), existing restrictions against the alienation of allotted lands of certain named Quapaw Indians were extended for 25 years from the date of such act. Anna Beaver was one of those named in such act. Such act provides that the lands of such named Indians may "be leased for mining purposes for such period of time and under rules, regulations, terms, and conditions only as may be prescribed by the Secretary of the Interior, and said lands while restricted against alienation may be leased for mining purposes only as provided herein." 41 Stat. 1249.

On October 18, 1922, the Commerce Company negotiated and entered into a new lease with Anna Beaver, subject to the approval of the Secretary, "for the period of 15 years from and after the date hereof and as long thereafter as lead and zinc may be produced in paying quantities but not longer than March 3, 1946." As additional consideration for such lease, the Secretary required the Commerce Company: To expend, in five years from the date of approval of such lease, $10,000 in prospect drilling on the allotment; to keep accurate and detailed maps of the workings of each mine on the allotment, and to furnish blueprints of such maps to the lessor or the representative of the Department of Interior whenever demanded; to permit an audit of its books and accounts semiannually or at such other times as the Secretary might direct, and to furnish copies thereof, without charge, to the Secretary; to keep and maintain a complete and adequate organization of mining engineers and accountants; to furnish proper supervision of the mining operations conducted on such allotment; to maintain a store-room, stockyard and machine shop with sufficient supplies and equipment to minimize delays resulting from break-downs and accidents; to permit the miners and other employees freedom of purchase; to operate on an eight hour day and not to employ any boy under the age of sixteen years or any girl or woman, without regard to age, underground. It provided that the royalty to be charged sub-lessees, including the base royalty, should not exceed 12½%; that the royalty provisions under such lease should be in force from and after its approval by the Secretary; and that the Commerce Company should give a bond with a responsible surety conditioned for the faithful performance of such lease and supplemental agreement. On July 9, 1923, the Secretary approved such lease and supplemental agreement. Such lease provided for a royalty of 7½% for a period approximating the unexpired term of the lease of June 11, 1915, and for a royalty of 10% thereafter.

Thereafter the Commerce Company executed and delivered to Wells, agent, a mining sub-lease on 180 acres of the leased premises, and to O. W. Sparks a mining sub-lease on 20 acres of such leased premises. The Secretary approved such sub-leases on October 22,

1924. On January 11, 1924, Wells assigned his sub-lease to R. H. Channings, Jr., agent. The Secretary approved such assignment on October 22, 1924. On October 3, 1924, Sparks assigned his sub-lease to the Blue Streak Mining Company, a corporation. The record does not disclose whether this assignment was approved by the Secretary.

Up to May, 1928, $707,829.11 in royalties had been paid to Anna Beaver, either directly or deposited to her credit with the Secretary, under the leases of June 11, 1915, and October 18, 1922. Of this sum, $625,161.83, or 88½%, had been paid under the lease of October 18, 1922.

After the lease of October 18, 1922, had been approved by the Secretary, Anna Beaver brought a proceeding before the Secretary to have the approval of such leases and sub-leases set aside. Upon a hearing, the Secretary refused to set aside the approvals.

Anna Beaver brought this suit against the Commerce Company and its sub-lessees alleging that they at all times have been and now are trespassers on her allotment, prayed for cancellation of each of such leases and sub-leases, for an injunction against further operation thereunder, and for an accounting for the ores extracted therefrom.

The trial court held that the leases of June 11, 1915, and October 18, 1922, were valid, and entered a decree dismissing the bill. Anna Beaver has appealed.

Counsel for Anna Beaver contends that all of such leases, except the lease of October 18, 1922, were overlapping leases, were violative of the restrictions imposed by Congress and were void. He cites in support of this contention United States v. Noble, 237 U. S. 74, 35 S. Ct. 532, 533, 59 L. Ed. 844, and Smith v. McCullough, 270 U. S. 456, 46 S. Ct. 338, 70 L. Ed. 682.

United States v. Noble, supra, was a suit brought by the United States to cancel certain leases and certain assignments of royalties under leases made by one Black Hawk, a Quapaw Indian. Such leases and assignments are described in the opinion of the Supreme Court, as follows:

"(1) Lease, dated January 11, 1902, to A. W. Abrams, for ten years from date, in consideration of the sum of $10, and a royalty of 5 per cent. * * * On August 13, 1903, the lease was assigned by Abrams to the Iowa & Oklahoma Mining Company.

"(2) Lease, dated August 24, 1903, to A. W. Abrams, for ten years from date, in consideration of $18, and of royalties which were the same as in first lease. * * * This lease was assigned on November 2, 1904, to the Iowa & Oklahoma Mining Company.

"(3) Lease, dated March 25, 1905, to L. C. Jones, and the appellee A. J. Thompson, for ten years from date, for $10 and 5 per cent royalty. It was stated that the lease was subject to the first lease above mentioned. The interest of Jones was assigned to the appellee A. J. Thompson on July 31, 1905.

"(4) Lease, dated April 4, 1905, to the Iowa & Oklahoma Mining Company, for ten years from date, for $25, with the same royalties as in the first lease above mentioned. * * *

"(5) Lease, dated May 12, 1906, to the same company, for ten years from date, and with the same consideration as that of the lease described in paragraph (4). It was provided that 'this lease and all former leases above referred to shall run concurrently,' —the lessee being entitled to elect under which of the leases it would operate.

"(6) Lease, dated July 28, 1906, to the same company, for the term of twenty years from date for $21, with the same royalties and minimum rental as those reserved in the preceding lease described in paragraph (5).

"(7) Grant or assignment, dated August 16, 1902, to the appellee Charles F. Noble, of all the allottee's 'right, title, and interest in and to the royalty, rent, and proceeds' of the mining lease dated January 11, 1902, made to Abrams, described in paragraph (1). * * *

"(8) Assignment, dated February 21, 1906, to the appellees A. S. Thompson and V. E. Thompson. It recited a judgment, in a suit against Noble and Cooper, decreeing that the allottee was the owner 'of 2½ percentage of the entire product mined from said land and sold on or subsequent to the 31st day of January, 1906, and up to and including the 11th day of January, 1912,' and assigned to the above-mentioned appellees 'an undivided one-half interest in and to the said judgment for royalties,' that is, '1¼ per cent of the whole product on said lands' during the period covered by the first lease to Abrams, described in paragraph (1)."

The government conceded the validity of the lease described in paragraph one. The trial court sustained the validity of the leases described in paragraphs two, three and four. It held that the leases described in paragraphs five and six were invalid. United States v. Abrams (C. C.) 181 F. 847. On appeal this decision was affirmed by the Eighth Circuit. United States v. Noble, 137

F. 292. The United States prosecuted an appeal from the decision of the Eighth Circuit to the Supreme Court and there questioned the decision of the lower court with reference to the lease described in paragraph three and the assignments of rents and royalties. It will be noted that the lease described in paragraph three was expressly subject to the prior lease of January 11, 1902, to Abrams and was inferior to the prior lease of August 24, 1903, to Abrams. The Supreme Court held that the lease described in paragraph three was either a lease in futuro or an assignment of the reversion and, in either event, it violated the restrictions imposed by Congress and was void.

■■■ The Noble Case is distinguishable from the instant case. The lease of August 22, 1911, was valid. The leases of August 22, 1911, September 28, 1912, September 19, 1913, and January 21, 1915, were to the same lessee and covered the same premises. Where there is an existing lease, the term of which has not expired, the acceptance by the tenant from the lessor of a new lease for the same premises, unless it appears that the parties intended otherwise, operates as a surrender of the first lease by operation of law. United States v. Noble (C. C. A. 8) 197 F. 292, 294; United States v. Abrams (C. C.) 181 F. 847; Diamanti v. Aubert, 68 Utah, 582, 251 P. 373, 374; Brown v. Linn Woolen Co., 114 Me. 266, 95 A. 1037, 1038; Enyeart v. Davis, 17 Neb. 228, 22 N. W. 449; Coe v. Hobby, 72 N. Y. 141, 146, 28 Am. Rep. 120; Fleischner v. Citizens' Real Estate & Inv. Co., 25 Or. 119, 35 P. 174, 176. The release of one party to the old lease is a sufficient consideration for the release of the other party. Diamanti v. Aubert, supra; Evans v. McKanna, 89 Iowa, 362, 56 N. W. 527; Ettlinger v. Kruger, 76 Misc. Rep. 540, 135 N. Y. S. 659; Eggers v. Paustian, 184 Iowa, 1250, 169 N. W. 739. It follows that each of the four last mentioned leases operated as a surrender of the lease immediately preceding it. Therefore, they were not leases in futuro nor assignments of the reversion, as was the lease held invalid by the Supreme Court in the Noble Case.

■■■ Furthermore, on June 11, 1915, Anna Beaver and Wills acting for the Commerce Company, which held assignments of all prior leases, entered into a contract for the cancellation of such prior leases and the surrender of the leased premises to Anna Beaver. On the same day, Anna Beaver executed a new lease to Wills, agent of the Commerce Company, for a term of ten years from its date, containing the provisions with reference to possession and the commencement of the term of the lease, hereinbefore set out. The validity of such a transaction was sustained in the case of the United States v. Abrams (C. C. A. 8) 194 F. 82, 83, where the court said:

"The act of Congress authorized a leasing for a term not exceeding 10 years. We perceive of no reason, and find nothing in the letter or spirit of the congressional enactment, which restrains her [the Indian lessor], after having made a lease, from entering into a valid contract with the lessee to cancel such lease before the expiration of its term, and then make a new lease to such party or parties as she might see fit for another term, not exceeding 10 years. This is what she did, and all that she did. We think it clear that the last-mentioned lease, of date March 21, 1910, was a valid lease."

The opinion in that case was handed down by the Eighth Circuit on March 4, 1912. The United States prosecuted no appeal therefrom, thus indicating that it accepted as correct the principles therein announced. Since the contract of June 11, 1915, effected a cancellation of the prior leases, and the lease of June 11, 1915, became immediately effective, and the Commerce Company went into immediate possession thereunder, it is clear that it was neither a lease in futuro nor an assignment of the reversion.

■■ On July 9, 1923, the Secretary expressly approved the lease of June 11, 1915. Should this be construed as an over-lapping lease to commence in futuro, Anna Beaver was not authorized to make it without the approval of the Secretary, under the Act of March 3, 1909. But it was so approved and such approval, if authorized, related back to June 11, 1915, the date the lease was made, and validated it from its inception. Barnett v. Kunkel (C. C. A. 8) 259 F. 394; Lykins v. McGrath, 184 U. S. 169, 22 S. Ct. 450, 46 L. Ed. 485; Anchor Oil Co. v. Gray (C. C. A. 8) 257 F. 277, 280, 281; Id., 256 U. S. 519, 522, 41 S. Ct. 544, 65 L. Ed. 1070.

■■ Counsel for Anna Beaver contends that the Secretary was not authorized to approve the lease of June 11, 1915, after the enactment of the Act of March 3, 1921. A very analogous situation was considered by the Supreme Court in Harris v. Bell, 254 U. S. 103, 113, 41 S. Ct. 49, 65 L. Ed. 159. The Act of April 26, 1906 (34 Stat. 137), prohibited the alienation of inherited lands by full

blood Indian heirs, without the approval of the Secretary. The Act of May 27, 1908 (35 Stat. 312), prohibited the alienation of inherited lands by full blood Indian heirs, without the approval of the court having jurisdiction of the settlement of the estate of the deceased allottee. The deed of the full blood Indian heir in Harris v. Bell, supra, was executed on January 15, 1908, and was approved by the Secretary on July 6, 1910. The court held that the 1908 act did not take away from the Secretary the power to approve deeds made prior to its enactment. Here, under both statutes, the power of approval is vested in the Secretary, and the latter act broadens the authority and discretion of the Secretary in this respect. We conclude that the Secretary was authorized to approve the lease of June 11, 1915.

For the reasons hereinbefore stated, we hold that the leases of August 22, 1911, and June 11, 1915, were valid.

▬ Counsel for Anna Beaver contends that the lease of October 18, 1922, was illegal and void because it was bottomed inseparably upon a consideration that was in part unlawful and was modified by another contract to which Anna Beaver was not a party.

As to the second ground of this contention, it is sufficient to say that this court held, in Whitebird v. Eagle-Picher Lead Co. (C. C. A. 10) 40 F.(2d) 479, that the Secretary had the power to make a lease of Quapaw lands without the consent of the incompetent Indian allottee. Furthermore, Anna Beaver wrote a letter to the Secretary expressing her consent to, and requesting the Secretary not to withdraw his approval of such lease and supplemental agreement.

It is true that, in fixing the royalty under the 1922 lease, consideration was given to the lesser royalty provided in the lease of June 11, 1915, and the unexpired term of the latter lease. Counsel's contention, however, is predicated upon the premise that the June 11, 1915, lease was invalid. We have concluded that such lease was valid. Therefore, it was neither illegal nor improper to take into consideration the royalty provision and the unexpired term of the 1915 lease, in arriving at the terms of the 1922 lease.

▬ Counsel for Anna Beaver contends that the 1922 lease was illegal because it was made in violation of the regulations promulgated by the Secretary on December 29, 1921. He asserts that such lease violated section 18 of such regulations, which provides that a lease "shall be for a fixed period of time to be determined in each case by the Secretary." While such lease did not specify the exact period for which it should extend beyond 15 years, it provided that it should be for so long as lead and zinc were found in commercial quantities but, in no event, beyond March 3, 1946. It provided means by which the term could be ultimately ascertained and made certain. It was a substantial compliance with the regulations. Section 10 of such regulations, in part, provides:

"Applications under the provisions of Section 10 for a lease or extension of lease or for the approval of said lease or extension of lease will not be received or considered prior to the period of one year next preceding the date of the expiration of such valid existing lease or leases as may be on the land covered by such application."

Counsel for Anna Beaver asserts that the above quoted portion of section 10 was violated because the term of the existing 1915 lease did not expire until 1925, and the new lease was approved in 1923. Even if the consideration of the 1922 lease by the Secretary in 1923 was contrary to such regulation, which we do not decide, his approval was not vitiated on that account. The Secretary had the power to suspend such regulations. Ingraham v. Ward, 56 Kan. 550, 44 P. 14; Gage v. Gunther, 136 Cal. 338, 68 P. 710, 89 Am. St. Rep. 141; Pickett v. Wallace, 54 Cal. 147; Knight v. United Land Ass'n, 142 U. S. 161, 12 S. Ct. 258, 35 L. Ed. 974.

▬ Counsel for Anna Beaver contends that the court should have held she was entitled to royalties on a basis of 7½% instead of 5% from October 18, 1922. The approval of the Secretary provided that the royalty provisions should be effective from the date of such approval. In this respect he modified the provisions of the lease negotiated between the Commerce Company and Anna Beaver. This he had full power to do under the decision of this court in Whitebird v. Eagle-Picher Lead Co., supra.

Counsel for Anna Beaver contends that the leases entered into between the Commerce Company and Anna Beaver, prior to October 18, 1922, were void, and that they so clouded the title of the allotment of Anna Beaver as to disable her from negotiating leases with any other person than the Commerce Company; that, because of these facts, the Commerce Company had no right to enter into the lease of 1922, even with the approval of

the Secretary. This argument is bottomed upon the proposition that the lease of August 22, 1911, and the lease of June 11, 1915, were void. We have already considered these leases and concluded that they were valid.

Finally, counsel for Anna Beaver contends that the lease of June 11, 1915, and the 1922 lease were invalid because the amount of royalties provided therein were inadequate. The amount of royalty provided in the lease of June 11, 1915, compares favorably with the amount of royalty reserved in other leases on undeveloped lands in the same vicinity as the Anna Beaver allotment. While a few of such leases reserved a royalty of $7\frac{1}{2}\%$, by far the greater number provided a royalty of 5%. The evidence wholly failed to establish that the royalty provision in the 1915 lease was inadequate. The amount of royalty in the 1922 lease rested in the discretion of the Secretary. It was his duty to determine the highest obtainable economic royalty, not the highest percentage of royalty, in order that all the ores should be mined and the greatest ultimate return obtained from such lands. This he did after obtaining the advice of experts. See Whitebird v. Eagle-Picher L. Co., supra. The Act of March 3, 1921, vested discretionary power in the Secretary to determine the amount of royalty and the other terms of mineral leases upon lands of Quapaw Indians named in such act. 41 Stat. 1248; Anicker v. Gunsburg, 246 U. S. 110, 119, 38 S. Ct. 228, 62 L. Ed. 603. The Secretary's determination of the proper amount of royalty, in the absence of a showing of arbitrary action or fraud, was final and was not open to review by the court. United States v. California & Oregon Land Co., 148 U. S. 31, 43, 44, 13 S. Ct. 458, 37 L. Ed. 354; United States v. De la Maza Arredondo, 31 U. S. (6 Pet.) 691, 728, 729, 8 L. Ed. 547; United States ex rel. Riverside Oil Co. v. Hitchcock, 190 U. S. 316, 325, 23 S. Ct. 698, 47 L. Ed. 1074; United States ex rel. McCullough v. Lane, 50 App. D. C. 123, 269 F. 202, 204. There is no evidence tending to show that the Secretary acted either arbitrarily or fraudulently.

We have examined the other contentions made by counsel for Anna Beaver, and find they are without merit.

We conclude that the leases of August 22, 1911, and June 11, 1915, and the lease of October 22, 1922, approved July 9, 1923, were valid, and that the decree of the trial court was right. It is therefore affirmed.