UNITED STATES v. NOBLE et al.

(Circuit Court of Appeals, Eighth Circuit. May 23, 1912.)

No. 3,551.

1. INDIANS (§ 16*)—INDIAN LANDS—MINERAL LEASES—EXTENSION—VALIDITY.
    Under Indian Appropriation Act June 7, 1897, c. 3, 30 Stat. 72, authorizing the leasing of Quapaw Indian lands for a term not exceeding 10 years for mining or business purposes, overlapping leases for 10 years are not void, though the later leases were not intended to operate as a surrender or cancellation of the earlier ones.
    [Ed. Note.—For other cases, see Indians, Cent. Dig. § 45; Dec. Dig. § 16.*]

2. INDIANS (§ 16*)—NECESSITY—EFFECT OF OMISSION.
    That mineral leases of Indian lands were not acknowledged did not affect their validity as between the parties.
    [Ed. Note.—For other cases, see Indians, Cent. Dig. § 45; Dec. Dig. § 16.*]

3. INDIANS (§ 16*)—INDIAN LANDS—RESTRICTIVE SALE.
    Where mining leases on Quapaw Indian lands provided for payment in addition to a cash consideration of royalties to the lessor in a sum of money equal to 10 per cent. of the market value of all the minerals taken from the land, etc., the fact that at the time the leases were made and later assigned the mineral was in the ground and constituted a part of the realty did not render the leases invalid, as a sale of a part of the real estate, in violation of Act March 2, 1895, c. 188, § 1, 28 Stat. 907, making such allotments inalienable for 25 years from the date thereof.
    [Ed. Note.—For other cases, see Indians, Cent. Dig. § 45; Dec. Dig. § 16.*]

    Adams, Circuit Judge, dissents.

Appeal from the Circuit Court of the United States for the Eastern District of Oklahoma.

Action by the United States against Charles F. Noble and others. Judgment for defendants (United States v. Abrams, 181 Fed. 847), and the United States appeals. Affirmed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Paul A. Ewert, Sp. Asst. Atty. Gen., for the United States.

Vern E. Thompson and S. C. Fullerton (A. S. Thompson and J. J. Bulger, on the briefs), for appellees.

Before ADAMS and SMITH, Circuit Judges, and MARSHALL, District Judge.

SMITH, Circuit Judge. The Quapaw Tribe of Indians were finally located in Indian Territory, now Oklahoma, and it was agreed their lands should be conveyed to them in common by the government under treaty proclaimed April 12, 1834 (7 Stats. 424).

[1] March 23, 1893, the Quapaw National Council provided for the allotment of these lands in severalty. By the Indian appropriation act of March 2, 1895 (28 Stats. 876, 907), Congress ratified and confirmed these and future allotments subject to revision, correction, and approval by the Secretary of the Interior, and the Secretary was authorized to issue patents, and provided that such allotments should be inalienable for 25 years from date of the allotment. In pursuance of this provision, there was allotted to Charley Quapaw Blackhawk 200 acres of land, which was duly patented September 26, 1896. By Indian Appropriation Act June 7, 1897 (30 Stats. 62, 72), it was provided:

"That the allottees of land within the limits of the Quapaw Agency, Indian Territory, are hereby authorized to lease their lands, or any part thereof, for a term not exceeding three years, for farming or grazing purposes, or ten years for mining or business purposes."

Under this provision Blackhawk, on January 11, 1902, leased his allotment to A. W. Abrams for mining purposes, for 10 years, for $10 down and 5 per cent. in value of all minerals, and $40 per annum for each paying gas well, with a guaranty that the royalties would equal $20 per annum. August 13, 1903, Abrams assigned this lease to the Iowa & Oklahoma Mining Company. August 24, 1903, Blackhawk, for $18 and the continuance of the royalties and a guaranty of $21 a year therefrom. made a new lease for 10 years to A. W. Abrams, and expressly canceled the former lease. The new lease was assigned on November 2, 1904, to the Iowa & Oklahoma Mining Company. March 25, 1905, Blackhawk, in consideration of $10 and the payment of 5 per cent. royalties, leased his allotment to L. C. Jones and A. J. Thompson, for 10 years, subject to the lease of January 1 (11), 1902, to Abrams. July 31, 1905. Jones assigned his interest in this lease to Thompson. April 4, 1905, Blackhawk leased his allotment for 10 years to the Iowa & Oklahoma Mining Company, for $25 and 5 per cent. of the mining product and $40 a year for each gas well, with a guaranty that the royalties would equal $21 per annum. August 16, 1902, Blackhawk assigned to Charles F. Noble the royalties, rents, and proceeds of the lease of January 11, 1902, to Abrams, and, if said lease was surrendered or became void, then for the period of 10 years, and on the same day Noble assigned one-half of his interest under the assignment to John M. Cooper. Subsequently suit was brought to set aside this assignment and was suc-

cessful as to one-half of the royalties after January 31, 1906, and thereafter Blackhawk assigned one-half of his half so recovered, or one-fourth of the royalties, to his attorneys A. S. Thompson and V. E. Thompson.

The United States government brought suit to set aside all the conveyances heretofore referred to and others, but, as it was successful on demurrer as to such other conveyances, they are not material here. As to these conveyances a demurrer was sustained to the bill (United States v. Abrams [C. C.] 181 Fed. 847), and the government appeals. It was held by the court in United States v. Allen, 179 Fed. 13, 103 C. C. A. 1, and by the Supreme Court in Heckman et al. v. United States, 224 U. S. 413, 32 Sup. Ct. 424, 56 L. Ed. 820, that suit could be brought by the United States to set aside a conveyance of the title within the period of restriction.

This case involves a different question as to the ability of the United States to maintain an action to set aside a lease covering the period authorized by the act of June 7, 1897. There is substantially no difference between this case and the case of United States v. A. W. Abrams et al., 194 Fed. 82, 114 C. C. A. 160, except that in that case it appears that, after the taking of the last lease, there was an express release of all the prior ones, and the lessee only claimed to hold under the last lease. That was true of all the leases here in question except the lease of April 4, 1905. The last-named lease was sustained upon the showing that the acceptance by the tenant of a new lease constituted a surrender of an old lease by operation of law unless the surrender would be contrary to the intention of the parties. 24 Cyc. 1369.

It is contended that, as a surrender on April 4, 1905, would at once turn the property over to Jones and Thompson under the lease of March 25, 1905, it was manifestly contrary to the intention of the parties to have the lease of April 4, 1905, considered as a surrender of the lease of August 24, 1903, as this would put Jones and Thompson in possession over 9 years before they would otherwise be so and leave a remnant of only about 10 days under the lease then being made. This court is, however, unable to find any necessity for a release of the old leases if none of them extended over 10 years from their execution.

The history of the change of the law with reference to the Indians must be borne in mind. At first treaties were negotiated with them as alien but dependent people, but it was established by the Supreme Court that the government was the guardian of the Indians, and that the authority of Congress was plenary as to them, yet they were largely independent of the ordinary rules of guardianship as to minors and as to persons of unsound mind. Originally they had no individual real estate, but as among themselves they bought and sold personal property without restraint, except in a few isolated instances their power to trade was limited to their own tribe. For example the Indian appropriation law of July 4, 1884 (chapter 180, 23 Stats. 94), provided that cattle purchased by the government and turned over to the Indians could only be sold to members of the same

tribe without the consent of the Indian agent. Laws were enacted prohibiting the liquor traffic with the Indians for the protection of the whites as much as the Indians. Other illustrations might be given of specific restrictions, but, in the absence of such restrictions, the Indians were as free to trade and barter as were white men, and their actions were as binding upon them. Finally Congress decided that the form of guardianship maintained, even free as it was from the ordinary restraints of that relation, could not be permanently maintained, but the Indians must be regarded as in a state of tutelage preliminary to their emerging into full citizenship. When the time for allotment came, they were usually made citizens of the United States, and were allotted lands in severalty, but they were restricted in selling them for 21 and 25 years. They were the owners of the lands subject to this restriction, and, when they were authorized to lease them for farming and grazing purposes for three years and for mining and business purposes for ten years, that was a distinct emancipation of them for the periods and the purposes named, and for such periods the government surrendered all guardianship over the Indians with reference to the specified leases of their lands.

It is contended that what is styled overlapping leases are invalid, and, when an Indian allottee has leased his land for 10 years for mining purposes, he cannot again lease it until the expiration of that period, and that such a construction would be for the Indian's benefit and protection. It may be such a provision would be for the Indian's better protection but it is for Congress to give such protection, and not the courts. No such provision can be found in the Acts of Congress.

[2] It is contended that the Jones and Thompson lease was not properly acknowledged, but this could not affect its validity as between the parties.

[3] It is claimed that the assignment of royalties was invalid because the metals were part of the real estate and their assignment constituted a sale of the same and they were consequently invalid.

It is true that at the time of the making of the assignments the ores were in the ground and part of the real estate, but the leases contemplated, as the law in authorizing mining leases must have contemplated, their separation from the real estate, and this far the leases were clearly legal. They provided not for turning over to Blackhawk 5 per cent. of the metal mined, but that the party of the second part should pay to the party of the first part a sum of money equal to 5 per cent. of the market value of all minerals. It was the sum of money which was assigned and this was not a violation of the prohibition of alienation for 25 years.

The decree is affirmed.

ADAMS, Circuit Judge (dissenting). The National policy disclosed by the act of June 7, 1897 (30 Stat. 62, 72), in so far as it related to Quapaw Indians was to permit them to part with the use and control of their several allotments for mining purposes for a limited period. The act permits them to lease their allotments for that purpose for a term "not exceeding ten years." In this legislation Congress was

concerned chiefly with the interest of its wards. It had the right to permit them to lease their allotments or not as to it seemed best. It had the right and it was the duty of Congress to surround them with such precautions and safeguards as would best subserve their interests. When that act was passed, the character and extent of the minerals underneath the surface of the Quapaw country were comparatively unknown. There were possibilities of great value in them, which most obviously should be realized by the Indians rather than by speculators. Leases for mining purposes were authorized for the period of 10 years, and not longer. During this period experimental work and much profitable mining might be done by the lessees, and the resources of the land so developed that the Indians might thereafter have and enjoy a valuable and well-developed mining property. Doubtless reasons like these actuated Congress to limit the leasehold terms as it did.

A brief résumé of the facts of this case shows that on January 11, 1902, Blackhawk leased his allotment to Abrams for a full term of 10 years for mining purposes. This lease was afterwards assigned to Iowa & Oklahoma Mining Company. On August 24, 1903, Blackhawk executed another mining lease to Abrams for the full term of 10 years. A clause in this last-mentioned lease declaring that "all leases or parts of leases heretofore made are by mutual consent canceled, annulled and abrogated" had no effect upon the lease of January 11, 1902, because that had already been assigned to the mining company, and Abrams presumptively had no power to cancel it. On November 2, 1904, Abrams assigned his second lease to the same mining company. Afterwards, on April 4, 1905, Blackhawk executed another mining lease to the mining company for another full term of 10 years. By these three leases the mining company became the owner either as original lessee or assignee of the original lessee of a continuous term from January 10, 1902, to April 4, 1915, of approximately thirteen years and three months duration. Not only so, but on March 25, 1905, Blackhawk executed another mining lease to the same allotment for a period of 10 years to L. C. Jones and A. J. Thompson which was subsequently assigned by Jones to Thompson. There were, therefore, four mining leases each for the full term of 10 years which, taken together, excluded the Indian from possession and enjoyment of his allotment for a considerable period of time in excess of 10 years.

We held in United States v. Abrams, 194 Fed. 82, 114 C. C. A. 160, just decided, that, where there had been several mining leases made by the same allottee and all had been in good faith canceled by the parties thereto, no obstacle was interposed to the making of another lease for the full period of 10 years. That is as far as my judgment permits me to go. The practice of securing overlapping leases for the same tract of land seems to me to be a device or expedient to circumvent the obvious purpose of the act of Congress. According to it, one person may not only secure, but may from the beginning intend to secure, a lease of mining land for periods of time in the aggregate far in excess of that which Congress permitted. This enables an Indian

to contract away his right of possession and enjoyment and his reasonable expectation for the future, contrary to the manifest policy of Congress. It opens a door to easy fraud upon the unsuspecting Indian and upon the law.

The answer to the conclusion I have reached, as I understand it, is that the Indian has never in fact made a lease for a term exceeding 10 years for mining purposes, and that, however many he may have executed, he is still within the letter of the law. He may be within the letter, but in my opinion he is not within the spirit of the law. For these reasons I am constrained to dissent from the opinion of the court in this case. I think the court erred in sustaining the demurrer of A. J. Thompson and in its construction of the statute so as to exonerate Abrams and the mining company from liability with respect to the leases of date August 24, 1903, and April 4, 1905. The court properly overruled the demurrer of Abrams and the mining company in so far as their attempted justification of a lease executed by Blackhawk on July 28, 1906, to the mining company for a period of 20 years, was concerned; and in my opinion their demurrer should have been overruled, not only as to the last-mentioned lease, but also as to the other leases secured by them, excepting the first one dated January 11, 1902.

I agree with the conclusion reached by the majority that the assignments by Blackhawk of the royalties reserved by him in the first Abrams lease to Noble, Cooper, A. S. and V. E. Thompson were valid, that the bill was properly dismissed as to these last-named defendants, and that as to them the decree below should be affirmed.