## DAY et al. v. CHARLTON et al.

No. 6304—Opinion Filed Oct. 17, 1916.

(160 Pac. 606.)

1. **Indians — Lands — Assignment of Royalties—Validity.**
An attempted assignment, by a full-blood Cherokee Indian, of accruing royalties under a departmental oil and gas lease upon his allotment, is void, unless such assignment be approved by the Secretary of the Interior.

2. **Assignments — Equitable Assignment — What Constitutes.**
An order or request in writing upon a third person to deliver to the maker thereof for his indorsement certain checks thereafter to be drawn against an accruing fund of the maker in the hands of another, such checks, after receiving such indorsement, to be delivered by another third person to the beneficiary of such order or request, does not operate as an equitable assignment of the fund against which such checks are to be drawn; the maker of the order or request not having relinquished full control over such fund.

(Syllabus by Johnson, C.)

Error from District Court, Washington County; R. H. Hudson, Judge.

Action by J. R. Charlton against Katie Day and others. Judgment for plaintiff against all the defendants, and for Katie Day for contribution from defendant C. M. Keefer. Defendants Katie Day and others bring error, and defendant Keefer brings error by cross-petition against the other parties. Reversed and remanded, with directions.

Geo. S. Hill and P. A. Sompayrac, for plaintiff in error Day.

H. H. Mongomery, for plaintiff in error Keefer.

James A. Veasey and J. P. O'Meara, for defendant in error Charlton.

Opinion by JOHNSON, C. This suit was commenced in the district court of Washington county by J. R. Charlton, defendant in error, as plaintiff, against James Day, Katie Day, and C. M. Keefer, plaintiff in error, and the Prairie Oil & Gas Company, defendant in error, as defendants. The material facts are as follows, viz.:

Harrison Day, a full-blood Cherokee Indian, during his lifetime, received as a portion of his allotment as a Cherokee citizen 80 acres of land described in the petition of plaintiff. On October 15, 1909, the said allottee, as lessor, executed to William V. Thraves and Alex Lewis, as lessees, an oil and gas lease upon the said lands, reserving to the lessor, as royalties under such lease, 12½ per centum of the gross proceeds of all crude oil which might be produced from such lands under the said lease. This lease was approved by the Secretary of the Interior of the United States. The interests of the lessees were subsequently assigned to one John A. Bell, the assignments being approved by the Secretary of the Interior. Under the lease, the land was prospected and became productive of crude oil in paying quantities. The part of the oil produced from the lease, which represented the royalties of lessor, was run into the pipe lines of, and purchased by, the defendant the Prairie Oil & Gas Company, the latter company during the lifetime of the allottee paying the proceeds thereof in money to the United States Indian superintendent, at Muskogee, Okla., to be handled and disbursed by such Indian superintendent under the rules of the Department of the Interior, in accordance with the provisions of the lease. During the year 1911, Harrison Day was prosecuted upon various criminal charges, and was represented in the criminal cases by the plaintiff J. R. Charlton, who is an attorney at law. Upon October 30, 1911, as a method of providing for the payment of the attorney's fees of the said Charleton in such criminal causes, the said Harrison Day executed an instrument in writing, which is as follows:

"I, Harrison Day, of lawful age, a citizen of Washington county, Okla., being first duly sworn, according to law, depose and say that I am a full-blood Delaware Indian, regularly enrolled as a citizen of the Cherokee Nation; that I am the owner of 80 acres of land, included in the approved oil and gas mining lease from which there will, from time to time, accrue certain royalties.

"I further state that there have been filed against me in the district court of Washington county, Okla., four felony charges; that I was tried upon one of said charges, and convicted and sentenced to serve a term of 10 years in the Oklahoma State Penitentiary, at McAlester, said sentence being the minimum sentence for the charge upon which I was convicted.

"I further state that for a certain consideration, my attorney, Mr. J. R. Charlton, has succeeded in having the three felony charges against me dismissed, so that when my sentence expires, I will be discharged from the state prison with no charge against me.

"I acknowledge indebtedness to my attorney, Mr. J. R. Charlton, for services rendered, in the sum of $1,000. In order to make payment of said indebtedness, I respectfully request the United States Indian superintendent of the Indian agency, Muskogee, Okla., and the cashier of said agency, to mail all vouchers and checks representing oil royalties on my land, to the district Indian agent at McAlester, Okla.; that said district agent may obtain my signature thereto and transmit said checks to my attorney, J. R. Charlton, of Bartlesville, Okla., this procedure to continue until the full amount of the above-mentioned fee of $1,000 is paid.

"I further state that I make this statement on my own free will and in the presence of Frank B. Long, district Indian agent.

"(Signed)     Harrison Day.
"Witnesses: Smith Lonsberry, Bartlesville, Okla.. John McMullen, Bartlesville, Okla."

The above instrument, together with a favorable report thereon by the local United States district Indian agent at Nowata, Okla., was filed by the said Charlton with the United States Indian superintendent, at Muskogee, Okla., who wrote to Charlton, acknowledging receipt of the instrument and report. the letter of the Indian superintendent containing the following expression, viz.:

"You are advised that in accordance with this report. the policy herein outlined (referring to the directions of the allottee contained in the written instrument of the allottee) will be followed in future and as rapidly as the royalties accrue, the signature of the indorsement of the lessor will be obtained 'on the checks and the same will be forwarded to you." (Parenthesis ours.)

In pursuit of the plan outlined in the Harrison Day agreement and the letter of the Indian superintendent, the Indian superintendent, during the lifetime of Harrison Day, forwarded checks for these royalties to the local Indian agent at McAlester, Okla., where Harrison Day was confined in the state penitentiary, for the indorsement of Day. Day, at first refused to sign any of the checks for delivery unless he should be turned out of prison. The Indian agent informed Charlton of this refusal, and advised him to go to McAlester and take the matter up in person with Day. Charlton went to McAlester and saw Day, and as a result of this conference, Day indorsed a part of the checks, upon which $200 was paid to Charlton. However, Charlton did not collect the full face value of these checks, and Day did not indorse all of the checks, but refused to do so. The $200,

above mentioned was the only amount collected by Charlton during the lifetime of Day.

Subsequently, Harrison Day died intestate, leaving as his sole heirs at law the plaintiffs in error James Day and Katie Day, his father and mother, respectively, who inherited each an undivided one-half interest in this land. By warranty deed, joined in by his wife, Katie Day, James Day conveyed his undivided one-half interest in the land to the plaintiff in error C. M. Keefer. After the death of the allottee, the Department of the Interior released its supervision of the lease, and the Prairie Oil & Gas Company continued to run the royalty oil through its pipe lines, paying the proceeds to the then owners of the fee in the land. This suit was brought by the plaintiff Charlton, on the purported assignment from Harrison Day, the allottee, to compel an accounting and payment out of the accruing royalties of the unpaid part of his fee under the contract with the allottee. Prior to the suit, the administrator of the deceased allottee paid to Charlton the sum of $110, leaving a balance on the attorney fee of $690, due at the time of the beginning of the action. It was agreed that C. M. Keefer was an innocent purchaser of the James Day interest in the land, without notice of Harrison Day purported assignment.

The lower court ordered an accounting, adjudged that the unpaid part of the attorney's fee be paid out of the interest of Katie Day in the royalties, and that defendant Keefer contribute to the payment of the fee in a sum equivalent to the part thereof due out of his interest in the royalties. Katie Day, James Day, and C. M. Keefer appeal from the general judgment, and Keefer appeals by separate cross-petition in error from the part of the judgment ordering contribution by himself.

It is contended by plaintiffs in error: (1) That, if the Harrison Day writing, by its terms, constituted what ordinarily in law is an assignment, it was not approved by the Secretary of the Interior, and therefore was void as being violative of the restrictions imposed upon said land by the acts of Congress; and (2) that the said writing was not in its terms an assignment. We are of the opinion that both contentions are correct.

1. It was contended by plaintiffs in error that the Harrison Day writing, if in its terms an assignment, was void for the reason that it was not approved by the Secretary of the Interior. The act of Congress of May 27, 1908 (35 Stat. 312, c. 199) which removed certain restrictions, and reimposed

and continued other restrictions, upon the lands of allottees of the Five Civilized Tribes, of which the Cherokee Tribe is one, contained the following provision, viz.:

"* * * All allotted lands of enrolled full bloods, and enrolled mixed bloods of three-quarters or more Indian blood, including minors of such degrees of blood, shall not be subject to alienation, contract to sell, power of attorney, or any other incumbrance prior to April twenty-sixth, nineteen hundred and thirty-one, except that the Secretary of the Interior may remove such restrictions, wholly or in part, under such rules and regulations concerning terms of sale and disposal of the proceeds for the benefit of the respective Indians as he may prescribe." Section 1.

The same act further provided that leases of restricted lands for oil, gas, or other mining purposes, might be made, with the approval of the Secretary of the Interior, under rules and regulations provided by the Secretary of the Interior, and not otherwise. Under this act, it is clear that Harrison Day, being a full-blood Cherokee Indian, could neither convey nor incumber, nor lease for oil and gas purposes any part of his allotment, without the approval of the Secretary of the Interior. In this case, we are called upon to determine whether, after leasing his lands for oil and gas mining purposes, with the approval of the Secretary of the Interior, he could then assign the royalties to accrue under such lease without the approval of the Secretary of the Interior. Under the acts of Congress providing for methods of dealing with allotted lands of the members of the Quapaw Nation of Indians, a Quapaw Indian was restricted from alienating his land, but was permitted to lease his lands for mining purposes for a term of ten years, without the supervision of any governmental agency.

In the case of the United States v. Noble, decided upon April 5, 1915, 237 U. S. 74, 35 Sup. Ct. 532, 59 L. Ed. 844, the Supreme Court of the United States held that the royalty reservation in an oil and gas lease of a Quapaw Indian was a part of the fee in the land, and that the Indian lessor was without power, under the congressional restriction upon alienation of the fee, to assign such royalties, without the approval of the Secretary of the Interior. In that case, the principle was enunciated that rents and royalties to accrue on such a lease are profits issuing out of the land, and as such are a part of the restricted estate remaining in the Indian allottee. The estate or interest represented by the royalties, and reserved by the lease to the lessor, was held to be restricted and unassignable by the Indian lessor, without the approval of the Secretary

of the Interior, although the original creation of the lessee's leasehold estate was without restriction. The conclusion of the Supreme Court of the United States in the Noble Case was contrary to the earlier conclusions of this court in the following cases, viz.: Wah-tah-noh-zhe v. Moore, 36 Okla. 631, 129 Pac. 877; Tidwell v. Dobson et al., 37 Okla. 180, 131 Pac. 693—and reversed the decision of the United States Circuit Court of Appeals in the Noble Case itself, as reported in 197 Fed. 292, 116 C. C. A. 654; and, in so far as the conflict goes, is controlling upon this court as an interpretation of the acts of Congress with reference to Indian lands.

The restrictions upon the power of the allottees of the Cherokee Nation, which we are dealing with in the present case, are much more stringent than existed in the Quapaw Nation, as illustrated in the Noble Case. In the Quapaw Nation, the allottee had the power to lease his lands for oil, without original supervision, and yet, in the Noble Case, the United States Supreme Court said that the reserved royalties in such a lease were a part of the restricted fee, and unassignable without departmental approval. The Cherokee full-blood allottee could not make the original lease, without the approval of the Secretary of the Interior. He could not convey the original leasehold interest of the lessee, without such approval. The original lease in this case, by its own terms, provided that it should be subject to the rules and regulations of the Secretary of the Interior, all of which rules and regulations were made a part of the lease, with the limitation that no regulations thereafter made should affect the term of the lease or the rates of royalties or payments thereunder. The lease further provided that assignments of any interest in the land might be made with the approval of the Secretary of the Interior. The record does not show what such rules and regulations were. The disposition of royalties, already accrued at the time of the Harrison Day purported assignment, as well as those to accrue thereafter, might depend somewhat upon these rules and regulations, which are not before us, and the effect of which we are therefor unable to determine.

It is contended by the defendant in error, Charlton, that the letter of the United States Indian superintendent, at Muskogee, and the action of the superintendent, and subordinates, in forwarding the checks, which were forwarded, and to this extent complying with and recognizing the Harrison Day writing as an assignment, constituted an approval of the instrument by the Secretary of the

Interior, as an assignment of the royalties. With this contention we cannot agree. The act of Congress does not give to the Indian superintendent, or his subordinates the power to approve such leases, or assignments thereof. The power is vested in the Secretary of the Interior. A consideration of the question as to the authority of the Indian superintendent and his subordinates to deal with accrued royalties, as distinguished from royalties to accrue after an assignment, might be influenced by the provisions of the rules and regulations of the Secretary of the Interior, pertaining to such matters. But, such rules and regulations are not in the record. We are not justified in indulging the presumption that such rules and regulations gave authority to the Indian superintendent, here sought to be established to have existed in him, from the mere fact of his having agreed to forward the checks in compliance with the request of the allottee, and of some of such checks having been so forwarded. However, there was no proof of the existence of royalties already accrued at the time of the execution of the purported assignment. The letter and actions of the superintendent did not tend to approve or recognize an assignment, but merely to recognize, and assist in carrying out the intentions and promise of the allottee to pay his debt from funds which might be allowed to him by the department, in its supervision of his affairs.

Following the conclusions of the Supreme Court of the United States in the Noble Case, so far as they are applicable to this case, and, bearing in mind the act of Congress governing the relations of the Cherokee allottees and their lands, as well as the specific terms of the oil and gas lease in this case, we are bound to conclude that the Harrison Day writing, here contended to be an assignment of the royalties under his departmental oil and gas lease, was in violation of the restrictions imposed by the acts of Congress, and void.

2. It is also contended that the Harrison Day writing did not, in its terms, constitute an assignment, and such is the opinion of this court. The departmental officials were the agents of the allottee, as well as of the government, in the handling of these royalties. The writing simply directed or requested one of the maker's agents, the Indian superintendent, to forward certain checks to another of the maker's agents, the local Indian agent at McAlester, the checks then to be indorsed by the said Harrison Day, and then to be delivered by the Indian agent to Charlton. The fund itself was not to be paid to Charlton, but individual checks were to be delivered to him, after they should have passed under the supervision and control of Day himself. This plan was recognized and followed by all the interested parties, and checks were not delivered when Day objected to the delivery or refused to execute the indorsements. Day retained and exercised complete control over the final delivery of the checks.

In order to operate, even as an equitable assignment, a written instrument, of such a nature, must make an absolute appropriation of the fund sought to be assigned to the use of the assignee. The intention of the assignor must be to transfer a present interest in the fund, to the exclusion of all control by the assignor over the fund. The transfer must be of such a character that the fundholder cannot only safely pay, but is compellable to do so, though he may be forbidden by the assignor. 5 Corpus Juris, 909, and notes, and 913; 4 Cyc. 45, 47; 3 Pomeroy, Eq. Jur. sec. 1280; Christmas v. Gains, 14 Wall. 69, 20 L. Ed. 762; Silent Friend Mining Co. v. Abbott, 7 Colo. App. 73, 42 Pac. 318; Christmas' Adm'r v. Griswold, 8 Ohio St. 558.

The Indian officials could not have been compelled to have delivered the checks in question under the Harrison Day writing, without the exercise by Day of the control which he reserved over them, and would not have been safe in doing so. The Day writing was not an assignment, legal or equitable, but merely a promise to pay out of a specific fund.

Other propositions are raised in the case, but the conclusions hereinabove reached are decisive of the issues, as between all of the parties.

The judgment of the lower court is reversed, and the cause remanded, with directions to the lower court to proceed in accordance herewith.

By the Court: It is so ordered.