## WHITEBIRD et al. v. EAGLE-PICHER LEAD CO. et al.

### No. 130.

Circuit Court of Appeals, Tenth Circuit.

April 4, 1930.

C. B. Ames, of Oklahoma City, Okl. (M. A. Whipple, of Tulsa, Okl., and B. A. Ames, of Oklahoma City, Okl., on the brief), for appellants.

Atlee Pomerene, of Cleveland, Ohio, and A. E. Spencer, of Joplin, Mo. (A. C. Wallace, of Miami, Okl., and Squire, Sanders & Dempsey, of Cleveland, Ohio, on the brief), for appellees Eagle-Picher Lead Co., Underwriters' Land Co., Consolidated Lead & Zinc Co., and Cortez-King Brand Mines Company.

Vern E. Thompson, of Miami, Okl., for appellees Childress Lead & Zinc Co., Black Eagle Mining Co., Frank Childress, Trustee, Lihme Zinc Co., Commonwealth Mining Co., and Whitebird Mining Company.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

PHILLIPS, Circuit Judge.

The appellants brought this suit to cancel three mining leases made on August 1, 1922, by Albert B. Fall as Secretary of the Interior, in behalf of the appellants, to The Eagle-Picher Lead Company, a corporation. Two grounds for relief are set up: First, that the leases were obtained through fraud and for a grossly inadequate consideration. Second, that the leases were not signed by appellants and that the Secretary of the Interior was without authority to sign or cause their names to be signed thereto.

The trial court found against the appellants on the issue of fraud and held that, under the provisions of section 26 of the Act of March 3, 1921, 41 Stat. 1225, 1248, the Secretary of the Interior was authorized to make the leases for and in behalf of the appellants.

I. The Charge of Fraud.

There was no direct evidence in support of the charge of fraud. The facts, upon which the appellants rely to support inferences of fraud, are these:

On September 26, 1896, allotments of 200 acres each were made to Eudora Whitebird, Mary Whitebird and Joseph Whitebird, who were full blood members of the Quapaw tribe of Indians. Appellants are all of the heirs at law of such original allottees and are also members of the Quapaw tribe of Indians.

In 1912, S. C. Fullerton and Geo. W. Beck, Jr., acquired leases on such allotments from the ancestors of appellants and leases on lands adjacent thereto from other Quapaw Indians, for lead and zinc mining purposes, each for a term of ten years and at a royalty of 5%.

In October, 1913, Fullerton sub-leased the lands embraced within the Whitebird allotments to The Eagle-Picher Company at a royalty of 12½%. During the years 1915 and 1916, The Eagle-Picher Company developed lead and zinc ores thereon and commenced mining such ores. After the commencement of the world war, because of the greatly increased demand for lead and zinc, The Eagle-Picher Company sub-leased to each of 27 mining companies tracts of 40 acres at a royalty of 17½%. At the time of the transactions hereinafter mentioned, The Eagle-Picher Company and its sub-lessees had constructed and were operating about 26 lead and zinc concentrating plants on these leases.

On January 15, 1921, John Barton Payne, Secretary of the Interior, addressed a letter to Homer P. Snyder, chairman of the house committee on Indian Affairs, in which he called attention to the matter of restrictions against the alienation of Quapaw allotments in Oklahoma under the Act of March 3, 1895, 28 Stat. 876–907. He stated that such restrictions would expire in September and October, 1921; that lead and zinc mining leases of such lands were made under the Acts of June 7, 1897, 30 Stat. 62–72, and March 3, 1909, 35 Stat. 781–783; that a competency commission had made examination and inquiry concerning certain Quapaw Indian allottee heirs and had found that 62 of them, among whom were appellants, were incompetent to care for their property and business affairs. He recommended that the restriction period be extended 25 years as to the lands of such 62 incompetent Indians, and submitted a draft of a proposed bill, which ultimately became section 26 of the Act of March 3, 1921. This Act extended the restrictions against alienation of the allotments of such 62 incompetent Indians for the additional period of 25 years. With reference to mining leases, it provided:

"Provided further, That all said lands allotted to or inherited by the Quapaw Indians may, when subject to restrictions against alienation, be leased for mining purposes for such period of time and under such rules, regulations, terms, and conditions only as may be prescribed by the Secretary of the Interior, and said lands while restricted against alienation may be leased for mining purposes only as provided herein."

In 1920, Fullerton, W. W. Dobson, Beck, The Eagle-Picher Company and 22 of the sub-lessees of the latter agreed that The Eagle-Picher Company should secure new leases from the Indians at a royalty of 7½% and present them to the Secretary of the Interior for approval; that it should sub-lease to the mining operators at a royalty of 15%; and that the 7½% profit should be divided between Fullerton, Dobson and Beck and The Eagle-Picher Company. In January, 1921, such new leases were secured from the Indians at a royalty of 7½% and were submitted to the Secretary of the Interior for approval, together with a full and frank disclosure of the arrangement between the several parties, as stated above. In its brief filed in support thereof, The Eagle-Picher Company stated that 15% was a fair operating royalty and 7½% a fair royalty to the Indians. This brief further showed that lead and zinc royalties ranged from 12½% to 17% in the general locality of the lands here involved. Vern E. Thompson, attorney for certain of the sub-lessees, also filed a brief in which he incorporated a statement from the State Auditor of Oklahoma showing that the royalties of several hundred lead and zinc mines in Oklahoma ranged from 5% to 20%, with a few at a considerably higher rate.

After a hearing, of which all interested parties had notice, Chas. H. Burke, Commissioner of Indian Affairs, in a letter to Secretary Fall, dated May 20, 1921, recommended that such leases be disapproved. In this letter, Commissioner Burke expressed the opinion that the Indians should receive a royalty of 15%.

On June 22, 1921, A. C. Wallace, attorney for The Eagle-Picher Company, wrote a letter to E. B. Meritt, Assistant Commissioner of Indian Affairs, in which he stated that The Eagle-Picher Company was concerned about renewals of its leases; that he understood from oral statements of Meritt that the interests of The Eagle-Picher Company would be taken care of and that Fullerton, Dobson and Beck, who were not mining operators, would be eliminated; and requested a conference with the commissioner and assistant commissioner of Indian Affairs.

On October 1, 1921, The Eagle-Picher Company wrote a letter to Fullerton, Dobson and Beck in which it stated that it considered the original agreement nullified by the department's disapproval of the leases and that The Eagle-Picher Company in the future would undertake to secure leases for its exclusive use and benefit.

Thereafter, The Eagle-Picher Company worked out a tentative agreement with its 27 sub-lessees for sub-leases at an operating royalty of 16%, with an over-riding royalty to it of 2½%, leaving 13½%, less the cost and expense of supervision, for the Indians. This tentative agreement was communicated to the department by letter dated November 4, 1921.

On December 29, 1921, new regulations were promulgated under the Act of March 3, 1921. These regulations were signed by Commissioner Burke and approved by E. C. Finney, as acting secretary of the interior. Section 6 of such regulations, in part, provides:

"In each lease or contract of extension of lease entered into and executed under these regulations, the bonus and royalty to be paid by the lessee to the Superintendent or such other official as the Secretary of the Interior may designate, for the benefit of the Indian lessor or lessors, shall be set out and stipulated and unless the rate of royalty be otherwise determined and fixed by the Secretary of the Interior under the provisions of these regulations, the royalty to be paid by the lessee shall be stipulated and fixed at the following percentages of the gross proceeds of the lead and zinc ores and concentrates mined or extracted from the leased premises, the royalty to be computed and based upon each sale of ore or concentrates separately:

"7½% when the price for the ore or concentrates sold is under $50 per ton;

"10% when the price for which the ore or concentrates sold is $50 or more per ton and less than $60 per ton;

"12½% when the price for which the ore or concentrates sold is $60 or more per ton and less than $70 per ton; and

"15% when the price for which the ore or concentrates sold is $70 or more per ton."

Section 10, of such Regulations, in part, provides:

" * * * Such new lease or leases or contract of extension of existing lease or leases shall be executed subject to these regulations by and between the Indian owner of the land, if an adult, and said proper party or parties. If, however, said adult Indian owner shall fail to execute such new lease or leases or contract of extension of existing lease or leases as determined upon by the Secretary of the Interior, the superintendent shall execute for and on behalf of said Indian owner of the land said new lease or contract of extension of existing lease. If the

Indian owner of the land is a minor, the superintendent shall execute the new lease or leases or contract of extension of existing lease or leases for and on behalf of said Indian minor. * * * No offering for sale at public auction or advertisement of sale will be necessary in reference to contracts of extension of leases or to leases entered into under this section, as above provided but such lease or contract shall be upon such terms as to bonus and royalty as may be determined and fixed in each case by the Secretary of the Interior under the provisions of section six of these regulations. * * * "

On February 11, 1922, Fullerton, Dobson and Beck filed bids on the three Whitebird allotments with the superintendent of the Quapaw agency. They offered the schedule set forth in section 6, supra, plus 2.5% when the price of ore should be under $60.00 per ton, plus bonuses as follows: Eudora Whitebird tract, $10,000; Mary Whitebird tract, $16,000 and Joseph Whitebird tract, $14,000.

On February 15, 1921, The Eagle-Picher Company addressed a letter to Commissioner Burke in which it offered to lease 1061 acres, including the three Whitebird allotments, at the schedule fixed in section 6, supra, and to sub-lease to its then operating sub-lessees at an advanced royalty of 2½%.

On February 16, 1922, the Eagle-Picher Company protested against the awarding of leases to Fullerton, Dobson and Beck, and called attention to its offer of February 15, 1922.

On March 20, 1922, Commissioner Burke addressed a letter to Secretary Fall in which he recommended that both of the last mentioned bids be rejected and that a leasing commission be appointed. This letter was approved by Secretary Fall on April 6, 1922. Thereupon, Commissioner Burke, with the approval of Secretary Fall, appointed a leasing commission composed of John E. Dawson, of the Indian office; T. B. Roberts, representative of Commissioner Burke, and O. K. Chandler, superintendent of the Miami Indian agency. Mr. Van Siclen, an expert mining engineer from the Bureau of Mines, and Mr. Seibenthal, an experienced geologist of the United States Geological Survey, at Commissioner Burke's request, were detailed to accompany, advise and assist the commission. The leasing commission arrived in the field March 22, 1922, and remained there until June 5, 1922. On June 5, 1922, the commission forwarded to Commissioner Burke a detailed report of its investigation, together with its findings and recommendations. This report recited that, on April 21, 1922, The Eagle-Picher Company submitted an offer to lease the entire six allotments at a royalty of 7½%, with an agreement to sub-lease to its operating sub-lessees at a royalty in no case exceeding 2½% above the base royalty; to prospect and develop lands not theretofore developed, so as to keep ahead of production, and to keep the mines in operation; to expend, in such work, a minimum of $200,000 at the rate of $40,000 per year; to furnish competent engineers to oversee the mining operations and see that the ground was mined in a workman-like manner; to continue experiments in concentration and treatment of ores to the end that a larger recovery might be obtained; to advance to its sub-lessees such money as good business judgment might require in order that they might not be forced either to abandon operations or to sell the ore at a price not remunerative to them or the Indians; to maintain accurate and comprehensive maps of all drilling and development, and to furnish its sub-lessees and the department with such maps; and to furnish a good and sufficient bond guaranteeing the carrying out of the terms and conditions of such leases; and that on May 26, 1922, The Eagle-Picher Company filed a modification of the bid in which it offered either to pay such royalty as the department should determine to be proper or to surrender the properties. The report further recited that, on April 27, 1922, Beck made a bid in which he agreed to pay the schedule of royalties set out in section 6, supra, to pay certain additional royalties based upon the prices of ore and to pay $50,000 in bonuses. It also called attention to the analysis made by Van Siclen, in his report to the leasing commission, of The Eagle-Picher Company bid and the Beck bid. This report of the leasing commission concluded, as follows:

"We have reached the conclusion, in view of the facts presented and of the Mining Engineer's report, that in regard to these six allotments of Quapaw Indian land, the best interests of the Indian owners of said land and of the mining industry as well, will be served if the leases be made to the Eagle-Picher Lead Company at the economic rates of royalty as found by the Mining Engineer for each particular tract or subdivision of said allotments, and provided that said Eagle-Picher Lead Company shall sub-lease to the operating mining company or parties owning the mills and mining property on said lands, the particular tracts of land occupied and operated by said mining companies or parties, and that the royalty rates to be

charged by the Eagle-Picher Lead Company to the sub-lessee operating company shall not exceed 1½% above the royalty rates to be paid by the Eagle-Picher Company on its leases.

"We, therefore, recommend that the leases be made to the Eagle-Picher Lead Company, upon the conditions above stated. * * * *"

Chandler filed a minority report in which he recommended that the leases be sold to the highest and best bidder for a maximum royalty of 15% to the mining operator.

On May 31, 1922, Secretary Fall addressed a letter to Assistant Commissioner Meritt in which he instructed the latter to take no action in the matter of applications for leases until the report of the leasing commission, then in the process of preparation, had been received.

On June 9, 1922, representatives of the Indians requested access to the report of the leasing commission. This request was denied.

After the report had been filed, Van Siclen prepared forms of lease proposals and submitted them to Commissioner Burke and to Secretary Fall. Secretary Fall disapproved the sliding scale of royalties provided in section 6, supra, and insisted that the proposals be made competitive and have publicity. Thereupon new proposals were prepared by Van Siclen, whereby provision was made for a flat royalty instead of a sliding scale of royalties. This was the principal modification. Secretary Fall prepared a notice calling for bids to be submitted on July 15, 1922, upon such proposals on file at Washington. This notice was published on July 6, 1922, in newspapers at Joplin, Missouri, and Miami, Oklahoma. It was also mailed to all prospective bidders in the tri-state district. The notice stated that the interests of mining operators, whose leases were about to expire, would be protected in so far as that could be done consistently with good administration of the properties. The notice further stated that the bids should state the amount of royalty the bidder proposed to pay and also the amount of royalty for which the bidder would be willing to sub-lease the lands to the existing mining operators.

On July 14, 1922, Victor Rakowsky, a mining engineer, requested that Commissioner Burke furnish him with certain information concerning the mines, which could have been secured from the report of the leasing commission. This request was denied. On July 15, 1922, Rakowsky made a similar request

of Secretary Fall, asking for access to the mines and the reports of the leasing commission, and for an extension of time for submitting bids to October 1, 1922. This request also was denied.

In response to such notice, Fullerton, Dobson and Beck submitted a bid on the Mary Whitebird allotment and for 80 acres of the Joseph Whitebird allotment, at a royalty of 15%, conditioned that the lease should be on a form then commonly used in the district. They also submitted a bid on the Mary Whitebird allotment at royalties ranging from 7½% to 12½%. Beck submitted a bid on the Joseph Whitebird allotment at royalties ranging from 10% to 12½% and on the Eudora Whitebird allotment at a royalty of 10%.

The Eagle-Picher Company submitted a bid on the six allotments, including the three allotments involved in this suit. They offered a base royalty of 10% and agreed to sub-lease for an additional royalty of 2½%. They agreed to expend $100,000 in five equal installments in prospect drilling under the supervision of the Secretary of the Interior; to expend $25,000 for experiments in ore extraction, with a view to securing a greater ore return; and to maintain a corps of competent engineers and accountants to supervise and record the mining operations on the allotments.

Twenty-two bids were received. Commissioner Burke made a detailed report thereon to the Secretary of the Interior and recommended the acceptance of The Eagle-Picher Company bid.

On July 27, Ray McNaughton wrote a letter to the Secretary of the Interior in which he stated that the Fullerton, Dobson and Beck bids were higher in the aggregate than The Eagle-Picher Company bid.

The leases were awarded to The Eagle-Picher Company on July 27, 1922, at a royalty of 10%.

From the foregoing facts, counsel for the appellants conclude: That the original plan offered was unfair and collusive.

That The Eagle-Picher Company was assured by Assistant Commissioner Meritt early in 1921 that it would be taken care of and that Fullerton, Dobson and Beck would be eliminated.

That The Eagle-Picher Company and the other mining operators, its sub-lessees, conspired together to stifle competition.

That the Fullerton, Dobson and Beck bids of February 11, April 27 and July 11, 1922, were higher than the bid which was accepted.

That the leasing commission was appointed in order to avoid acceptance of the February 11, 1922, bids of Fullerton, Dobson and Beck.

That the Secretary of the Interior rejected the recommendations of the leasing commission.

That the published notice did not allow sufficient time for preparation and submission of bids.

That the requirement in the notice prepared by Secretary Fall, requiring the bidder to state the royalty at which he would sublease to the mining operators, eliminated competition.

That the Secretary of the Interior withheld the report of the leasing commission from the Indians and prospective bidders.

That the Secretary of the Interior rejected the sliding scale of royalties recommended by Van Siclen.

That the conditions of the proposals could not be understood by Fullerton, Dobson and Beck.

That a royalty of 10% was inadequate.

Counsel for appellants contend the trial court should have inferred, from the facts above recited, that Secretary Fall and The Eagle-Picher Company had a private understanding that such company was to be given the leases at an inadequate royalty, to be effected by exacting terms and conditions that would stifle competitive bidding, and that the court should have concluded that Secretary Fall and The Eagle-Picher Company were guilty of fraud, which rendered the leases invalid.

Following the close of the war, large stocks of surplus lead and zinc were thrown upon the market, with the result that zinc, the predominating metal in the mines in question, fell from $135 to $20 per ton. The Eagle-Picher Company and its sub-lessees, who were actually operating the mines and who had invested several millions of dollars in development and in mining plants and equipment, were confronted with the decrease in the price of metals and with the fact that their leases would expire in 1922. They accordingly evolved the original plan referred to above. While this plan was not fair to the Indians and provided an operating royalty that was higher than an economic royalty, the plan was fully and fairly presented to the department in the application for approval of the leases, and was rejected.

The statement of Assistant Commissioner Meritt that The Eagle-Picher Company and the other mining operators, its sub-lessees,

would be fairly treated, and the manifest lack of desire on the part of the department to lease to Fullerton, Dobson and Beck were not improper under the existing circumstances. The former were mining operators, who had invested large sums of money in developing the mines and in mining plants and equipment, and the latter were speculators, who hoped to profit by sub-leasing the properties. Such was the conclusion of Van Siclen, as stated in his report to the leasing commission. Manifestly, the elimination of the speculators would increase the royalty to the Indians and keep the operating royalty nearer to an economic basis. Leases at the highest economic royalty, to the persons then equipped to operate and who were then actually operating the mines, would not only be fair but advantageous to appellants.

The appointment of the leasing commission and the securing of the services of Van Siclen and Seibenthal cannot be properly attributed to a desire to avoid accepting the bids of Fullerton, Dobson and Beck. Subsequent events conclusively proved that Commissioner Burke acted wisely in appointing such leasing commission and in securing the expert advice of Van Siclen and Siebenthal. For such action, Commissioner Burke deserves commendation rather than censure. Seibenthal was the zinc expert of the United States Geological Survey, a geologist with 25 years' experience in the district where these mines were located and an eminent authority on lead and zinc mining. Van Siclen was an experienced and noted mining engineer. Commissioner Burke testified that he recommended this leasing commission because he was a layman and knew nothing about lead and zinc mining, and desired the advice and assistance of experts.

The examination of the mines by the leasing commission covered a period of about 2½ months. It secured from each mining operator answers to questionnaires showing acreage, ore reserve, mill recovery, cost of mining and cost of improvements. Van Siclen examined the 28 mines. He checked the answers in the questionnaires against the facts and records on the ground. He gathered and compiled complete data in respect to these mines. This data was checked by Seibenthal. A public hearing was held by the commission at Miami and a uniform form of bid was furnished to the mining operators.

In his report to the leasing commission, Van Siclen said, in part:

"In negotiating new leases upon restricted Quapaw restricted land, the ends to be sought in the order of their importance are:

"1. To secure a fair return to the Indian owner for the occupation and use of his land.

"2. To fix rates of royalty that will permit and encourage the operator-lessee to:

"(a) Mine the ores to their economic limits for the life of the lease or until the ores are exhausted. On these particular lands the second alternative will nearly always be the case.

"(b) Prospect the land thoroughly by means of drilling or drifting for ore bodies at present unknown.

"(c) Maintain a reasonable hope of realizing operating profits. The Indian Office, representing the owner, cannot undertake to guarantee any profits, or any given return upon invested capital, or anything of that nature. It can, and must for the best interests of the Indian afford the operator-lessee a fair chance to make profits.

"(d) Remain and continue mining on his lease in spite of greater apparent chances for profits that may arise elsewhere.

"Practically considered, the second aim is as important as the first, because unless the land is mined, the Indian will receive no royalty, while the land's value for farming purposes has already been greatly impaired if not destroyed."

In such report, he also set forth what he calculated to be the economic royalties for each mine in terms of the sliding scale set forth in section 6, supra. He also transposed such economic royalties into terms of flat royalties. Such flat royalties ranged from 7.5% to 13%. The average flat royalty for the group of mines was 9.87%. In referring to his statement of economic royalties, Van Siclen stated "the difference between the existing 17.5 per cent. and the economic 9.87 per cent. represents the eliminated intermediate royalties, which, in this now developed field, stands for no useful purpose." He pointed out how a larger royalty and bonus would compel the closing of the weaker mines and the mining of only richer ores in order to enable the operator to pay such royalty and bonus and still operate at a profit.

In analyzing the Beck bid of April 27, 1922, which offered a bonus of $50,000 and contemplated an operating royalty of 15%, Van Siclen said:

"Under the 15% Beck operating royalty * * * the poorer mines could not stand a levy for a bonus. Hence the bonus would be levied on the stronger mines, such as the three Picher mines, Premier, Underwriters, etc. There is no justification for such a levy, as the mines would already be paying an excessive royalty under the Beck 15%, and the imposition of a bonus in addition would form a load that it would not pay any operator to take on. The result would be that the Beck associates would be forced to close and abandon the weaker mines and to operate the stronger mines themselves under the 12½% ground royalty, in order to recoup the bonus money and make any additional operating profit out of the better mines.

"Adjusted Royalties, in terms of flat royalties, shows that a 15% operating royalty would force many of the weaker mines to close. The richer and larger mines could and would carry on by selective mining (gutting) until their ores rich enough to carry the excessive charge were exhausted; which is very closely the present situation among these mines. This would mean that the Indian owners of the poorer mines would receive no income, while the Indian owners of the better mines would receive more immediate but less total income. Taking the mines as a group, the total royalties received, including the $50,000 bonus, would total less by ¼ to ⅓ than the economic royalties total; and would be very inequitably distributed among the Indian owners."

Referring to indirect leasing through a supervising parent corporation, Van Siclen said:

"Under this system the supervision expense is collected from the industry and paid to the supervising corporation. It, therefore, means somewhat higher total cost of operation to the industry, but increased protection and more continuous operation, to the resulting advantage of both operator and owner. This system has been in successful operation for many years in the Tri-State District."

In such report, Van Siclen stated his conclusions as follows:

"1. Engineer's conclusions.

"a. These 28 mines are more than half worked-out, and their remaining values are fairly well known.

"b. They should therefore be leased upon terms that will assure the fullest extraction of their remaining ore reserves, and of the lowest minable grade.

"c. Under such conditions the imposition of bonuses or excessive royalties will shorten their working lives and reduce their total gross returns and therefore their royalty-producing power.

"d. The maximum return to the allottees will be made under economic royalties and no bonuses.

"e. Supervision and operation will be better maintained under the parent company system with government control, than under the direct leasing system with direct government supervision.

"f. Of the two available parent companies, the Eagle-Picher is more suitable than the Beck, because:

"1. Their organization is complete, ample and has been functioning on this particular job to the satisfaction of the operating sublessees since 1916.

"2. They originally drained and developed the Picher camp, and have a better working knowledge of it than any other existing or probable organization.

"3. Their own investment in this district is heavy, and it is more to their interest to keep the district satisfactorily producing than to any other existing or probable organization."

Van Siclen recommended the acceptance of The Eagle-Picher Company bid at the economic royalties set forth in his report, on condition that The Eagle-Picher Company keep the mines de-watered without cost to the sub-lessees.

From the foregoing, it will be seen that it was extremely desirable to know the highest economic operating royalty and to lease the lands upon such basis in order that the maximum recovery of ore might be had and the greatest income thereby obtained for the Indian owners.

Van Siclen's analysis of the Beck bid filed with the leasing commission clearly demonstrated that the royalty offered, plus the bonuses, were higher than the economic royalty and would ultimately result in a substantially less return to the Indian owners than would a lower royalty and no bonuses.

. The desire to protect the rights of existing operators and the demand that bidders who proposed to sub-lease should express the over-riding royalty they would demand from sub-lessees, as indicated in the notice prepared by the secretary, were proper. Limitation on the over-riding royalty was essential in order to prevent the operating royalty from exceeding the maximum economic royalty. Furthermore, The Eagle-Picher Company and its sub-lessees, because of their knowledge of the district, their existing investment and their mining plants and equipment, were in a position to operate the mines more economically than could a new operator.

They were desirable lessees. Commissioner Burke and Van Siclen testified that Secretary Fall did not follow the leasing commission's recommendation that the bid of The Eagle-Picher Company be accepted, because he objected to the sliding scale of royalties and he desired public notice and competitive bidding. Van Siclen further testified that the only material change made by Secretary Fall in the proposals prepared by Van Siclen was the substitution of the flat royalty for the sliding scale of royalties; and that "he - (Van Siclen) preferred a flat royalty and thought the department did right in leasing the property as they did * * * that, after having been through this entire matter, his best judgment was that they let the leases in the right way, independent of any influence of the Secretary." In the light of subsequent events, the rejection of the sliding scale was proper. Up to the time of the trial, the return under the leases had been greater than it would have been under the sliding scale.

The time for bidding was adequate. Notice of the new plan and the uniform proposal not only were on file in Washington, but were mailed to all the operators in what is known as the tri-state district—the lead and zinc mining district of Missouri, Oklahoma and Kansas.

Denials of Rakowsky's requests were not improper. Much of the data obtained by the leasing commission was confidential information furnished by the operating companies. Rakowsky waited until the day before the bids were finally to be submitted. He stated not that the information was desired to enable him to bid but rather to determine whether he should submit a bid and, in any event, that he could not intelligently submit a bid before October 1, 1922. The old leases were about to expire. The existing royalties were inadequate. Continued operation under the old leases was not desirable. It was important that the new leases be made at the earliest possible date.

The bids were examined and considered by Commissioner Burke, Assistant Commissioner Meritt, Dawson and Van Siclen. They found that the bid of The Eagle-Picher Company was the highest and best bid. By a letter to the Secretary of the Interior, dated July 27, 1922, the commissioner recommended the acceptance of The Eagle-Picher Company bid, giving cogent reasons why it was the best and highest bid.

The Fullerton, Dobson and Beck bids, made in response to the notice of July 6, 1922, did not comply with the terms of the propos-

als and the royalties offered were, in some instances, higher than the economic royalty.

The Eagle-Picher Company's bid, made in response to the notice of July 6, 1922, offered an operating royalty which was close to the economic royalty recommended by the Engineer and will result in a greater ultimate return to the Indians than any of the other bids, hereinabove referred to, which were rejected by Secretary Fall.

While The Eagle-Picher Company receives a 2½% overriding royalty from its sub-lessees, for this it has agreed to furnish supervision and accounting, to make experiments in ore concentration, to expend substantial sums in prospect drilling, to finance its sub-lessees, and to keep all the mines free from water. Keeping the mines de-watered is of great importance, and The Eagle-Picher Company, because of its central pumping plant is particularly well equipped to render that service. Commissioner Burke, in his report to Secretary Fall, stated that Van Siclen's figures showed such 2½% to be a fair charge for the services which The Eagle-Picher Company agreed to render.

It is our conclusion that the evidence wholly failed to establish the charge of fraud and, on the contrary, showed that Secretary Fall and Commissioner Burke, acting in good faith, secured and accepted the advice of competent experts, obtained the highest possible economic royalties and fully and adequately protected the interests of the Indians.

II. Authority to Cause Leases to be Executed.

 Counsel for the appellants contend that, under the Act of March 3, 1921, the Secretary of the Interior had no authority to execute mining leases for the Indians named therein and that under it he had authority only to approve or disapprove, under regulations promulgated by him, leases that had been duly made by guardians of such Indians, appointed by the county court of the county wherein the lands were situate.

Counsel for the appellants assert that authority to appoint such guardians was given to such county court by the Act of April 28, 1904, 33 Stat. 573, and section 19 of the Oklahoma Enabling Act, 34 Stat. 277.

Congress, by express enactment, has empowered the county courts of Oklahoma to approve certain leases of lands of members of the five civilized tribes, who are minors or incompetents. Act of May 27, 1908, 35 Stat. 312. No such provision is found in the legislation applicable to the Quapaws. As stated by Judge Van Valkenburgh in Hampton v. Ewert (C. C. A. 8) 22 F.(2d) 81, 90, the absence of such provision "is conclusively significant." Where county courts are authorized to approve such leases, they act as federal agencies. Parker v. Richard, 250 U. S. 235, 239, 39 S. Ct. 442, 63 L. Ed. 954; Marcy v. Board of County Commissioners, 45 Okl. 1, 144 P. 611. Such power exists because the county courts have been designated as federal agencies by Congress, and not as the result of any power vested in them as state courts. Parker v. Richard, supra. The absence of any specific provision authorizing the county court to act in cases of incompetent or minor Quapaw Indians, and especially the omission to so provide in the Act of March 1, supra, which dealt exclusively with incompetent Quapaw Indians, manifests an intention upon the part of Congress to vest such authority in the Secretary of the Interior.

Furthermore, we think the intent of Congress, to vest exclusive authority in the Secretary of the Interior to make such leases, is clearly manifested by the language of the 1921 Act. It provides that such lands may "be leased for mining purposes *for such period of time and under such* rules, regulations, *terms, and conditions only* as may be prescribed by the Secretary of the Interior." (Italics ours.) This vests exclusive authority in the Secretary to determine and prescribe the terms and conditions of such a lease and the period of time for which it shall run. Nothing is left for negotiation by the Indian or his guardian. The only action that the Indian or his guardian could take, with respect to such a lease, would be to sign or refuse to sign it. If appellants' position is well taken, the Indian or his guardian, by refusing to sign, could frustrate the action of the Secretary in prescribing the terms of and negotiating such a lease. We do not think Congress intended to place such a veto power in the Indian or his guardian.

 The language of the 1921 Act is undoubtedly broader than the prior Acts and yet the Department of Interior had uniformly held that such Acts vested power in the Secretary to provide for the execution of mining leases in behalf of incompetent and minor Quapaw Indians. See opinion of solicitor, Department of Interior, under date of August 23, 1920; section 8, Regulations, April 7, 1917, under Act of June 7, 1897; section 8, Regulations, November 12, 1920, under the Acts of June 7, 1897, and March 3, 1909. The construction of a statute, by

a department of the government charged with its execution is entitled to respectful consideration and ought not to be overruled without cogent reasons. United States v. Moore, 95 U. S. 760, 763, 24 L. Ed. 588; Blanset v. Cardin, 256 U. S. 319, 326, 41 S. Ct. 519, 65 L. Ed. 950; United States v. Jackson, 280 U. S. 183, 50 S. Ct. 143, 74 L. Ed. ——.

It is our conclusion that the Secretary had full power, under the Act of March 3, 1921, to cause the leases in question to be executed on behalf of the appellants by the Superintendent of the Quapaw Indian agency, acting in behalf of the Secretary of the Interior.

The decree is affirmed with costs.